Lee Squitieri
lee@sfclasslaw.com
SQUITIERI & FEARON, LLP
32 East 57th Street, 12th Floor
New York, New York 10022
Telephone: (212) 421-6492
Fax: (212) 421-6553

Kenneth A. Wexler
kaw@wexlerwallace.com
Bethany R. Turke
brt@wexlerwallace.com
Catherine C. Howlett
ch@wexlerwallace.com
WEXLER WALLACE LLP
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

Gretchen M. Nelson (112566)
gnelson@kreindler.com
KREINDLER & KREINDLER LLP
707 Wilshire Boulevard, Suite 4100
Los Angeles, CA 90017-3613
Telephone: 213-622-6469
Facsimile: 213-622-6019
*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| ACE ARTS, LLC, | Case No. |
| Plaintiff, | CV13- 4096 MWF (Ex) |
| v. | **COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF** |
| SONY/ATV MUSIC PUBLISHING, LLC, APPLE CORPS LIMITED, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiff Ace Arts, LLC ("Ace"), for its Complaint against defendants Sony/ATV Music Publishing, LLC ("Sony/ATV") and Apple Corps Limited ("Apple Corps") alleges as follows:

## NATURE OF THE ACTION

1.    Plaintiff has the rights to distribute a documentary film, *The Beatles: The Lost Concert* ("the Documentary"), about the initial impact of The Beatles in America from the vantage point of the group's first United States concert, held on February 11, 1964 in Washington, D.C. (the "D.C. Concert"). That historic concert was filmed for theatrical release and had two official theatrical showings a few months after the D.C. Concert. The company that funded, taped, and exhibited the D.C. Concert allowed the film of the concert (the "Tape") to be transferred without copyright protection. No copyright was ever filed on the performances recorded on the Tape or the Tape itself. A copy of the Tape was acquired by an entity that has allowed the Producers (hereinafter defined) of the Documentary to use it.

2.    The Tape is 35 minutes long and is embedded in the 86-minute Documentary, the exhibition rights to which are controlled by Plaintiff Ace. The Documentary was produced by an award-winning team specializing in the production of documentary films in the music/performance genre. In addition to the amounts paid to acquire the Tape, over a million dollars were spent producing the Documentary. These sums were to be recouped through the exhibition of the Documentary, which defendants wrongfully halted.

3.    The high quality and marketability of the Documentary was such that a major exhibitor, Screenvision Exhibition, Inc. ("Screenvision"), contracted to exhibit the Documentary in theaters across the United States on a limited basis as a prelude to, and to generate national awareness of, the Documentary before it was marketed to domestic cable outlets, DVD distributors, wholesalers and retailers, and other media distribution entities. The value of rolling out and presenting the Documentary was reasonably projected to be in the hundreds of millions of dollars. The initial domestic theatrical distribution, however, was the key because—like the business model for first run movies to DVD and cable—other sales depended on the success and scale of the initial theatrical exhibition.

-2-

4.     Ace and Screenvision executed a distribution contract dated September 27, 2011 (the "Distribution Contract"), a copy of which is attached as Exhibit A. Pursuant to the Distribution Contract, Ace and Screenvision contracted with more than 500 theatres across the United States, sold tickets, and invested in promotion, publicity, and advertising for the anticipated nationwide exhibition. The Documentary was to debut at the Ziegfeld Theater in New York City on May 6, 2012. The Ziegfeld premiere was the subject of stories in national and local trade and general interest media. *See* Ex. B. Screenvision was preparing to add another 500 theatres to the exhibition schedule and to extend the initial run of showings from 2 days to 2 weeks.

5.     The publicity of the scheduled screenings alone elicited interest in the licensing of the Documentary by two American television networks and two DVD labels.

6.     At the eleventh hour, in mid-April 2012, Sony/ATV, at the insistence of, and in conspiracy with, Apple Corps, wrongfully interfered with the Distribution Contract by making false statements to exhibitors, theater owners, and potential distributors concerning Ace's legal right to exhibit the Documentary, making unjustified threats of legal action, and filing a baseless lawsuit in England.

7.     Defendants' interference was deliberate and knowingly baseless, as both Sony/ATV and Apple Corps knew that neither had a copyright in the Tape or any other legal basis to bar the exhibition of the Documentary.

8.     These actions caused Screenvision to refuse to perform under the Distribution Contract and caused the Ziegfeld Theater to back out of the premiere. As a result, Plaintiff was deprived of the monetary benefits of the Distribution Contract, and the post-theatrical distribution potential of the Documentary was prevented from being realized. Plaintiff was damaged financially, reputationally, and artistically.

-3-

9.     Defendants' interference with the valuable contract between Ace and Screenvision led to the financial ruination of Ace and the producers of the Documentary.

10.     In addition, consumers were deprived of (i) a worthwhile addition to the historical analysis of The Beatles' initial foray into the United States; and (ii) an alternative to Apple Corps' 2010 commercial release of a film that incorporated only part of the Tape and was made available only to those who purchased The Beatles Anthology through the iTunes Store.

11.     Defendants' conduct gives rise to a claim under the Sherman Antitrust Act, claims for tortious interference with contract and interference with prospective economic relations, a claim for unfair competition, and a request for declaratory judgment concerning Sony/ATV's misuse of its copyrights on certain Beatles' compositions.

## II. PARTIES

12.     Ace is a New York Limited Liability Company located at 101 Greene Street, New York, New York and was a party to, and the beneficiary of, the Distribution Contract with Screenvision and the amendments thereto.

13.     Sony/ATV is a limited liability company and the publisher of John Lennon/Paul McCartney compositions.  Formed under the laws of the state of Delaware, with one of its principal places of business in Los Angeles, California, Sony/ATV is part of an international music publishing group owned 50% by Sony Corporation and 50% by the estate of Michael Jackson.

14.     Apple Corps Limited is a UK registered company through which The Beatles' business interests are conducted.  Apple Corps operates throughout the United States, including in Los Angeles.

## III. JURISDICTION AND VENUE

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337, and 1338 because, *inter alia*, it is an action brought under the laws of

-4-

1   the United States, including the Sherman Act, 15 U.S.C. § 1, the Clayton Act, 15

2   U.S.C. §§ 15(a) and 26, and the Copyright Act, 17 U.S.C. § 101, *et seq.*

3   16.   This Court has supplemental jurisdiction over Ace's state law claims

4   pursuant to 28 U.S.C. § 1367.

5   17.   Pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391, venue is proper in

6   the Central District of California because Defendant Sony/ATV has significant

7   business operations within this judicial district and its Los Angeles office was

8   involved in some of the acts described herein.

9   ## IV.   SUBSTANTIVE ALLEGATIONS

10   **A.   The D.C. Concert Was Taped And Had An Initial Theatrical**

11   **Exhibition**

12   18.   The D.C. Concert, the first live concert performance by The Beatles in

13   the United States, took place on February 11, 1964 at the Coliseum in Washington,

14   D.C.  According to music critics, the D.C. Concert signified the first incursion of

15   the "British Invasion" into U.S. popular culture (*i.e.*, the appearance in America of

16   a multitude of British music performers, including "The Rolling Stones,"

17   "Herman's Hermits," "Lulu," and others).  The concert featured The Beatles

18   performing twelve songs.  It is arguably the single most important concert The

19   Beatles ever performed.

20   19.   The D.C. Concert was filmed by the National General Corporation

21   ("NGC"), an insurance and entertainment company.  It was recorded on a two-inch

22   standard American "quad" videotape with an eight-man crew and was mixed live

23   on location.

24   20.   Embedded in the Tape are the performances of eight original Beatles'

25   compositions (the "Songs") and four cover versions of songs written by other

26   musicians.  Aside from bootleg recordings, the Tape is the only complete recording

27   of a Beatles' concert.

28   21.   The filming of the D.C. Concert was authorized by the performers and

-5-

1   the then-owners of the copyrights in the songs.  The Tape reflects a "credit" to The

2   Beatles' then-manager Brian Epstein and to NEMS, Epstein's management

3   company.

4        22.    The Tape was a "work made for hire" for NGC and thus the right to

5   any copyright in the original video elements of the Tape belonged to NGC, not The

6   Beatles or Sony/ATV or Apple Corps or The Beatles' then-record label.

7        23.    The Tape was screened via a closed-circuit telephone network to

8   theaters in the United States in March 1964, approximately one month after the

9   D.C. Concert.  It is estimated that more than 500,000 people paid to attend these

10   theatrical screenings.

11      **B.**    **The Rights To The Tape of the D.C. Concert Are In The Public**

12           **Domain**

13        24.    Publication of the Tape occurred by at least 1974 when it was sold

14   without copyright protection, after which the Tape became immediately and

15   permanently dedicated to the public domain.

16        25.    In the early 1970's, Eugene Klein, NGC's Chairman and major

17   stockholder, transferred ownership and custody of the Tape to Malcolm Klein.

18   NGC's successor, American Financial Company, eventually liquidated NGC's

19   assets in 1974 and 1975.

20        26.    In 1987, James Karnbach acquired the Tape from Malcolm Klein.  Mr.

21   Karnbach made a Betacam copy of the Tape.  Mr. Karnbach sold the original

22   master copy of the Tape to Apple Corps in 1995, but retained the Betacam copy of

23   the Tape.  Mr. Karnbach's statement is attached as Exhibit C.

24        27.    According to Karnbach, two transfers of the Tape were made before

25   1989 without copyright notice.

26        28.    The first of these pre-1989 transfers occurred when Eugene Klein

27   transferred ownership of the Tape in the early 1970s, when any rights NGC had in

28

the footage would have been vested therein. No one has ever claimed Eugene Klein was not authorized to dispose of the master Tape on behalf of NGC.

29. The second of the pre-1989 transfers took place in 1987, when Malcolm Klein sold the Tape to Karnbach without attaching any prescribed copyright notices or mentioning any such copyrights in the accompanying documentation.

30. Mr. Karnbach has confirmed that there was no copyright notice on the copy of the film he purchased—not in the film itself, on the reel, or on the packaging. Other evidence corroborates his statement.

31. Photographs of the Tape and its box are shown on the website http://www.beatlesource.com/bs/to-washinton1.html, titled "Washington Coliseum February 11, 1964" and captioned: "Thie [sic] reel of video tape was auctioned by It's Only Rock And Roll in 2005." The auction's description of the Tape—reproduced beside the photographs on the website—included the following statements:

> There exists no title or copyright regarding this show and no copyright notices are seen on this master tape. In addition, the company that filmed and produced the presentation has been out of business for over 35 years.
>
> The videotape has been inspected and viewed at a professional lab (keep in mind that this format has been obsolete since 1980) and the technician concurs that this tape is, indeed, the first generation master! He has supplied a letter to that effect, in addition to detailing the procedure of how to deal with this obsolete format. The actual reel and box in which the tape has been housed since 1964 weighs in at approximately 25 pounds.

-7-

> A screening can be arranged in Manhattan for seriously
> interested bidders that meet certain qualifications.
>
> We can unequivocally say that there exists no other
> videotaped Beatles concert that remotely approaches the
> quality of this performance by The Beatles at Washington
> Coliseum.

*See* Ex. D.

32.  No one secured copyright protection on the Tape and the Tape was published in the early 1970s without notice of copyright. Accordingly, the Tape entered the public domain as a result of the failure to copyright and is available for commercial exploitation, notwithstanding the objection of the owners of copyrights in the Songs.

33.  According to a Copyright Research Report dated July 27, 2010, the Tape was commercially exploited multiple times between 1964 and 2010. *See* Ex. E. No notice of copyright in the Tape was provided upon the occasion of any of these publications. Nor is any registration of a claim of copyright reflected in the records of the United States Copyright Office.

34.  When Apple Corps registered the 1991 motion picture *The Beatles: The First US Visit*, it did not claim copyright in the Tape.

35.  Although the Tape was included in *The Beatles Anthology* and *The Beatles Anthology No. 1-8* video cassettes, which Apple Corps registered for copyright on December 5, 1995 and October 6, 2003, respectively, the requested copyright was claimed only on compilations and editing of old materials and new cinematography, new materials, texts, sounds and photos, not the Tape.

36.  In 1998, Apple Corps released *The Beatles First U.S. Visit*, a DVD (later re-released in 2004 and screened in LA in 2011) that contained excerpts of

-8-

the Tape.  That release did not reflect any copyright in the Tape.

37.     In or about October 2003, Passport International Productions of California, Inc. ("Passport"), an active video content repackager, issued a videodisc entitled *The Beatles in Washington, D.C. Feb. 11th, 1964*.  Passport claimed copyright only on the editing and compilation of this work.

38.     The Tape was again seen publicly in November 2010, when it appeared as part of a film that Apple Corps offered exclusively on the iTunes Store as part of a promotion for the release of *The Beatles Anthology* on the web-based sales platform.  Apple Corps' film included only three songs played at the D.C. Concert and was limited to ten minutes of audio and video footage from the Tape.

39.     No claimant has ever come forward to challenge these uses of the Tape, which preceded the Documentary.

40.     The foregoing unprotected, unchallenged publications of the Tape, a so-called "derivative work,"[1] has carried the underlying compositions (incorporated by permission of their copyright owners) into the public domain as well.  The 1964 filming of the D.C. Concert was authorized, and therefore the underlying musical works performed by The Beatles during the D.C. Concert are freely available for use in connection with the exploitation of the Tape.

**C.      An Affiliate Of The Plaintiff Acquired The Tape For The Production And Exhibition Of A Documentary About The Beatles' First American Concert**

41.     In 2009, Karnbach sold a Betacam copy of the Tape and all right, title, and interest thereto to Concert Magic, Inc. ("CMI").  CMI subsequently provided the Tape to WPMC Limited ("WPMC"), a production company that, together with

---

[1] Section 101 of the Copyright Act defines a derivative work as one "based upon one or more preexisting works, such as a . . . motion picture version . . . or any other form in which a work may be recast, transformed or adapted."  17 U.S.C. § 101.

Iambic Media Ltd. ("Iambic" and, collectively with WPMC, the "Producers"), produced the Documentary and granted distribution rights to Ace for use in the production, marketing, and commercial exploitation of the Documentary.

42.   Iambic was an independent production company founded by acclaimed producer Christopher J. Hunt.  Iambic produced over ten music documentaries between 2004 and 2007, including productions focusing on Joan Sutherland, Maria Callas, Elaine Stritch, The Beatles, Michael Jackson, and ABBA.  Iambic has earned over thirty nominations and awards in major festivals worldwide, including two BAFTA awards and four EMMY awards.

43.   The production of the Documentary took several years of work beginning in approximately 2009.

44.   The Documentary consists of the entire D.C. Concert footage and newly-filmed sequences, including contemporary interviews with individuals connected to the D.C. Concert and expert commentary on the cultural significance of the event.  The Documentary includes new and previously unseen interviews with Beatles' associates, family members, journalists, disc jockeys, concert attendees, historians, and renowned members of the music industry, including Chuck Berry, Sid Bernstein, Albert Hammond, Jr., Louise Harrison, Mark Ronson, Bruce Spizer, Steve Tyler, Joe Perry, and Mike Mitchell.

45.   The Documentary is an extended illustration of an important historical-cultural event, which the Documentary as a whole is designed to explore and explicate.  The Documentary's narration and the interpolated on-screen comments of cultural critics, musicians, and fans place the copyrighted music in a new context and thus constitutes a transformative creation.

46.   There is a public interest and benefit in having access to this piece of music history.  Indeed, Peter Brodsky, Sony/ATV's Executive Vice President, Legal and Business Affairs, told Iambic's Hunt that the Documentary was a film the public ought to see.

-10-

47.     Plaintiff's intent in using the Tape in the Documentary was not to attract attention solely to the Songs in the Documentary or to use the music, in its own right, for entertainment purposes.  Indeed, the sound quality with which the Songs are heard (in the original Tape and hence in the Documentary) is relatively poor; they represent the minimum quality needed to accomplish the Documentary's narrative goals.  Plaintiff's use of the Tape—including the Songs—is nonetheless integral to the purpose of the Documentary: to demonstrate the excitement and significance of The Beatles' "invasion" of the United States.

48.     Ace carefully and prominently avoided creating any misrepresentation of association with Apple Corps or The Beatles or endorsement thereby and avoided any trademark infringement or other violations of any rights.

**D.     Sony/ATV And Apple Corps Worked In Concert to Block The Exhibition Of The Documentary**

49.     The songs performed by The Beatles in the Tape include:  (1) "Roll Over Beethoven"; (2) From Me To You"; (3) I Saw Her Standing There"; (4) "This Boy"; (5) "All My Loving"; (6) "I Wanna Be Your Man"; (7) "Please Please Me"; (8) "Till There Was You"; (9) "She Loves You"; (10) "I Want To Hold Your Hand"; (11) Long Tall Sally; and (12) "Twist And Shout."

50.     Sony/ATV has asserted that it owns rights in the following compositions:  "She Loves You"; "All My Loving"; "I Wanna Hold Your Hand"; "This Boy"; "From Me To You"; "I Saw Her Standing There"; and "I Wanna Be Your Man."  Sony/ATV has also asserted that it owns 66.66% of the rights in "Twist & Shout."

51.     In or about 2009, the Producers and Apple Corps discussed the Producers' use of the Tape.  At that time, Apple Corps claimed rights only in the performers, publicity, and trademarks, not the Tape[2] or the Songs.  The Producers

_____

[2] Apple Corps has never claimed copyright in the original footage—only in its

1    received a legal opinion assuring them that the exhibition of the Documentary

2    would not infringe any of Apple Corps' rights.

3        52.    The Producers sought a synchronization license from Sony/ATV in

4    2009 and 2010 as a matter of sound business strategy.  Moreover, at the time,

5    neither the Producers nor Ace had conducted the exhaustive research—undertaken

6    later—which confirms that the Tape enjoys no copyright protection.

7        53.    The Producers and Sony/ATV engaged in confidential negotiations

8    (the "Negotiations") for the synchronization license.

9        54.    On April 21, 2010, after viewing the footage, Sony/ATV made an

10   offer to Hunt that included the terms of an agreement to provide royalties to

11   Sony/ATV from the exhibition of the Documentary.  Hunt accepted Sony/ATV's

12   terms on April 22, 2010.  Sony/ATV confirmed its approval on September 2, 2010.

13   The agreement was memorialized in writings exchanged between the parties (the

14   "Agreement").

15       55.    In reliance on the Agreement, Ace and the Producers continued to pour

16   resources into the completion of the Documentary and, later, for marketing and

17   promotion.

18       56.    Unbeknownst to the Producers, Sony/ATV did not keep the

19   Negotiations confidential.  Apple Corps was, in fact, in direct contact with

20   Sony/ATV and communicated with Sony/ATV about the Documentary.  Sony/ATV

21   kept Apple Corps informed of the Negotiations and discussions between the

22   Producers and Sony/ATV.

23       57.    The Producers learned, through an admission by Sony/ATV employee

24

25   original contributions to productions that also incorporated the original footage
     from the Tape (*e.g.*, Apple Corps' original contributions to the film it sold on the
     iTunes Store).  A valid copyright, together with any requisite notice and relevant

26   chain-of-title formalities, would have enabled Apple Corps to also assert its own
     copyright in the original footage, both when applying for the U.S. Copyright Office

27   registrations described above and in its exploitations detailed above.  Apple Corps
     did not do so.

28

Karina Masters, that Apple Corps and Sony/ATV had agreed that Apple Corps' approval of a project would be a precondition to any Sony/ATV license for The Beatles catalogue where a project involved certain visual and/or vocal elements. Indeed, Sony/ATV's London-based Solicitor, Andrew Malcolm Forbes, admitted that Apple Corps exercised considerable control over Sony/ATV's licensing decisions with respect to the Songs in the Tape.

58.     On September 28, 2010, Sony/ATV learned that Apple Corps was planning to release a film of the D.C. Concert.  Thereafter, motivated by its business relationship with Apple Corps, and contrary to the terms of the Agreement previously reached with the Producers, Sony/ATV granted an exclusive synchronization license to Apple Corps in order to, upon information and belief, provide Apple Corps with a means to block exhibition of the Documentary.  The license purportedly granted Apple Corps the right to match any offer for synchronization rights as to a product utilizing footage of the D.C. Concert and would bind Sony/ATV to grant such rights exclusively to Apple Corps if the latter matched the offer.

59.     Exclusive synchronization rights are highly unusual in the industry; given the nature of synchronization rights, it is generally not economically rationale to grant exclusive rights to one party.  Nevertheless, Sony/ATV granted such an exclusive synchronization license to Apple Corps, despite the Agreement reached earlier with Hunt.

60.     In October 2010, Apple Corps wrote to the Producers' attorney, threatening the Producers with infringement of "performers' rights," even though the Tape is a legally published, authorized recording of the D.C. Concert.

61.     In November 2010, Sony/ATV formally abrogated the licensing agreement with Hunt and the Producers and threatened to sue the Producers if they refused to agree not to exploit the Tape of the performance involving the copyrighted works.  Sony/ATV did this despite the fact that it asserted copyright in

-13-

the eight Songs but claimed no copyright in the Tape or performances.

62.    Apple Corps CEO Jeff Jones told one of the Producers that Apple Corps could prevent exploitation of the Tape by telling right-holders—like Sony/ATV—to withhold their rights.

63.    Rakesh Sanghvi ("Sanghvi"), Managing Director of Sony/ATV in the United Kingdom, told Hunt that Sony/ATV withdrew from the Agreement at Apple Corps' request.

64.    Brodsky told one of the Producers that Sony/ATV wanted to perform the Agreement but that Sony/ATV had to inform Apple Corps and allow Apple Corps the right to what Sony/ATV had given to the Producers.

65.    The Producers subsequently conducted exhaustive research regarding any potential copyright in the Tape and confirmed that the Songs performed by The Beatles during the D.C. Concert were freely available for use in connection with the exploitation of the Tape.

66.    The Producers decided to move forward with the exhibition of the Documentary.  Hunt contacted Sanghvi in March 2012 to inform him of the planned exhibition.  Hunt offered Sony/ATV an *ex gratia* payment, even though a license was unnecessary, in order to avoid any potential threat of meritless infringement litigation.

67.    In late April 2012, Sony/ATV refused Hunt's offer, indicating it would take legal action to prohibit exhibition of the Documentary.

68.    In May 2012, Sony/ATV and Sony/ATV Music Publishing (UK) Limited ("Sony Publishing")[3] commenced legal action against the Producers in England (the "London Proceeding"), alleging that Sony/ATV's copyright in the Songs was sufficient to allow the court to grant its application to enjoin the

[3] Sony Publishing is Sony/ATV's exclusive licensee of the UK copyrights in the Songs.

1    exhibition of the Documentary.

2          69.    The London Proceeding was accompanied by communications to

3    Screenvision, the Ziegfeld Theater, and other U.S. theatres planning to show the

4    Documentary, demanding that they not exhibit the Documentary and causing them

5    to pull the showings.

6          70.    After being informed of the London Proceeding, Screenvision told Ace

7    that it would not authorize the exhibition of the Documentary without written

8    confirmation from Sony/ATV that Ace had the right to use the Songs in the

9    Documentary.

10         71.    The owner/operator of the Ziegfeld Theater stated that it would not

11   proceed with the screening without a written license from Sony/ATV.

12         72.    When Ace could not provide such written confirmation, Screenvision

13   cancelled the Ziegfeld premiere.

14         73.    Sony/ATV's baseless lawsuit therefore had its intended effect, which

15   was to interfere with Ace's Distribution Contract with Screenvision and the

16   exhibition of the Documentary.

17                        **FIRST CAUSE OF ACTION**

18   **AGAINST DEFENDANTS FOR VIOLATION OF SECTION 1 OF THE**

19                              **SHERMAN ACT**

20         74.    Plaintiff repeats and realleges the allegations of paragraphs 1 through

21   73 as if set forth fully herein.

22         75.    Beginning no later than 2010, Defendants Apple Corps and Sony/ATV

23   conspired and acted jointly to unreasonably restrain trade by keeping the

24   Documentary off of the market.  Their actions occurred in and substantially affected

25   interstate and foreign commerce, and their conduct has injured the Plaintiff in

26   violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

27         76.    The concerted action engaged in by Defendants in their efforts to

28   restrain trade and competition occurred in and/or affected interstate or foreign

commerce.  Specifically, Defendants' unlawful actions prevented Plaintiff from exhibiting the Documentary in theaters across the United States.  Additionally, Apple Corps' product incorporating the Tape was sold via the iTunes Store to consumers throughout the United States, and Sony/ATV licenses its music throughout the United States.

77.  Defendants' conspiracy is anti-competitive and illegal *per se* under Section 1 of the Sherman Act.

78.  Defendants' unlawful conspiracy unreasonably restrains competition in the relevant market and violates Section 1 under the rule of reason.

79.  There is no legitimate, procompetitive business justification for Defendants' conduct that outweighs the harmful effect thereof.

80.  To the extent Plaintiff is legally required to prove monopoly power circumstantially by first defining a relevant product market, Plaintiff alleges that the relevant market is Beatles-related audio-visual media.

81.  The relevant geographic market is the United States and its territories.

82.  Plaintiff suffered substantial injury in its business and property as a direct and proximate result of Sony/ATV's and Apple Corps' conduct.

83.  Accordingly, Plaintiff seeks actual damages and treble damages against Defendants, an award of attorneys' fees and costs of suit, and injunctive relief to remedy Defendants' unlawful conduct (including, but not limited to, an Order enjoining Defendants from claiming a right to prohibit the exhibition of the Documentary and mandating the retraction of prior statements concerning such an alleged right).

## SECOND CAUSE OF ACTION
## FOR DECLARATORY RELIEF FOR SONY/ATV'S COPYRIGHT MISUSE

84.  Plaintiff repeats and realleges the allegations of paragraphs 1-83 as if fully set forth herein.

85.  Sony/ATV has asserted rights in eight of the compositions in the Tape.

-16-

1  Through the acts described herein, Sony/ATV has engaged in an unlawful
2  campaign to extend the scope of any such rights under the copyright laws.

3       86.    Plaintiff can incorporate the Tape (including the Songs performed
4  therein) into the Documentary, without any license from Sony/ATV, because
5  unprotected, unchallenged publications of the Tape have carried the underlying
6  compositions into the public domain.

7       87.    Plaintiff can also incorporate the Tape (including the Songs performed
8  therein) into the Documentary because Plaintiff's use of the Tape in the
9  Documentary constitutes a "fair use" under 17 U.S.C. § 107.

10      88.    Sony/ATV's actions in leveraging its copyrights on the Songs in order
11  to suppress the distribution and exhibition of the Documentary constitute copyright
12  misuse.

13      89.    Sony/ATV's copyright misuse has injured Plaintiff and prevented
14  Plaintiff's exploitation of the Documentary, its own original work.

15      90.    An actual controversy between the parties exists at this time as to
16  whether Sony/ATV's copyrights on the Songs allow it to prohibit Plaintiff's
17  exhibition and distribution of the Documentary, as Screenvision has refused and
18  continues to refuse to perform under the Distribution Contract because of
19  Sony/ATV's copyright misuse.

20      91.    Unless the Court resolves this matter, Sony/ATV's tactics will
21  continue to harm Plaintiff by disrupting its exhibition of the Documentary.

22      92.    Accordingly, Plaintiff is entitled to a declaratory judgment establishing
23  that Sony/ATV has misused its copyrights on the Songs and that the Documentary
24  and Plaintiff's exhibition thereof does not infringe any of Sony/ATV's alleged
25  copyrights.

26      93.    Plaintiff seeks a further declaratory judgment establishing that the
27  unprotected, unchallenged publications of the Tape under the circumstances
28  described herein have carried the Songs into the public domain.

-17-

## THIRD CAUSE OF ACTION

## AGAINST DEFENDANTS FOR TORTIOUS INTERFERENCE WITH CONTRACT

94.     Plaintiff repeats and realleges the allegations of paragraphs 1-93 as if fully set forth herein.

95.     Defendants—motivated by their desire to preclude any competition to Apple Corps' film on iTunes, prevent Plaintiff from gaining any prominence or prestige in any Beatles-related audio-visual media, and control all Beatles-related audio-visual media in the marketplace—intentionally interfered with the Distribution Contract between Ace and Screenvision, without privilege or justification, through conduct specifically designed to induce a breach or otherwise disrupt their contractual relationship.

96.     The Distribution Contract is valid, enforceable, and fully executed. Screenvision has always been ready, willing, and able to perform the Distribution Contract and would have done so but for Defendants' interference.

97.     Under the Distribution Contract, the Documentary was scheduled to premiere with two shows at the Ziegfeld Theater on May 6 2012, followed by showings in movie theaters across the United States on May 17 and May 22. Tickets were available on Ticketmaster.com, Fandango.com, movietickets.com, and moviefone.com.

98.     Media attention for the premiere of the Documentary was enormous. Articles appeared on deadline.com, huffingtonpost.com, variety.com, examiner.com, drafthouse.com, perezhilton.com, Chicago suntimes.com, bbc.co.uk, and Associated Press, among others.  Plaintiff reasonably anticipated earning profits and gaining invaluable prestige, exposure, publicity, and market awareness for the Documentary.

99.     Defendants knew of the Distribution Contract and its basic terms.  In conspiracy with and at the insistence of Apple Corps, Sony/ATV communicated

-18-

1  directly with Screenvision on May 3, 2012—just days before the scheduled

2  Ziegfeld premiere—falsely stating to Screenvision that the Documentary infringed

3  on Sony/ATV's copyrights and demanding that Screenvision not exhibit the

4  Documentary.  These communications were intentionally designed to, and did in

5  fact, induce a breach and disruption of the Distribution Contract.

6      100.   That same day, Screenvision informed Ace that Screenvision would

7  not authorize the Ziegfeld premiere unless Ace provided written confirmation from

8  Sony/ATV, by close of business on May 4, 2012, that Ace had the rights to use the

9  Songs in the Documentary.

10     101.   When Ace could not provide such written confirmation, Screenvision

11  cancelled the Ziegfeld premiere.

12     102.   Screenvision subsequently made a demand to Plaintiff for restitution of

13  all costs for marketing, public relations, and losses of its own and those of

14  participating theater owners.

15     103.   As a result of the breach of contract, Plaintiff has sustained and

16  suffered loss and damages.

17     104.   Defendants have obtained commercial benefit through the use of the

18  unlawful conduct described herein, including, for example, by unfairly eliminating

19  competition in the market for Beatles-related audio-visual media.

20     105.   Defendants have received such commercial benefit, fees, and other

21  monies and consideration at the expense of Plaintiff.

22     106.   The amount of such benefits, monies, fees, or consideration due

23  Plaintiff from Defendants cannot be ascertained without an accounting of the

24  income and gross profits that Defendants obtained through their wrongful conduct.

25  Plaintiff is entitled, therefore, to an accounting.

26

27

28

## FOURTH CAUSE OF ACTION
## AGAINST DEFENDANTS FOR
## INTERFERENCE WITH PROSPECTIVE ECONOMIC RELATIONS

107.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 106 as if set forth fully herein.

108.   Defendants—motivated by their desire to preclude any competition to Apple Corps' film on iTunes, prevent Plaintiff from gaining any prominence or prestige in any Beatles-related audio-visual media, and control all Beatles-related audio-visual media in the marketplace—intentionally interfered with the prospective economic relations between Plaintiff and third parties, without privilege or justification, through conduct specifically designed to interfere with or disrupt such economic relationships.

109.   Plaintiff engaged in business discussions and exchanged information with potential third-party distributors and exhibitors of the Documentary (*e.g.*, Screenvision, U.S. movie theaters (including the Ziegfeld Theater), two American television networks, and two DVD labels), which resulted in economic relationships with a probable future of economic benefit or advantage to Plaintiff through theatrical and post-theatrical exhibition of the Documentary.

110.   Defendants knew of Plaintiff's prospective economic relations.  In conspiracy with and at the insistence of Apple Corps, Sony/ATV intentionally conveyed false information to Screenvision and the Ziegfeld Theater regarding the copyright status of the Documentary and demanded that they not exhibit the Documentary, for the purpose of disrupting Plaintiff's relationship with Screenvision, the Ziegfeld Theater, and other distributors and exhibitors of the Documentary.

111.   Following these communications, the owner/operator of the Ziegfeld Theater stated that it would not proceed with the screening without a written license from Sony/ATV.

-20-

1      112.   Screenvision informed Ace that it would not authorize the Ziegfeld

2   premiere unless Ace provided written confirmation from Sony/ATV, by close of

3   business on May 4, 2012, that Ace had the rights to use the Songs in the

4   Documentary.  Screenvision also indicated that it would not exhibit the

5   Documentary in *any* theater if the dispute was not resolved it its satisfaction.

6      113.   When Ace could not provide such written confirmation, Screenvision

7   cancelled the Ziegfeld premiere.

8      114.   Screenvision indicated that it "hope[d] the issues w[ould] be resolved

9   in short order so the attraction c[ould] be rescheduled for an even larger theatrical

10  run in late Summer 2012."

11     115.   To date, Plaintiff has been unable to exhibit the Documentary due to

12  Defendants' conduct.

13     116.   As a result of Defendants' conduct, Plaintiff has suffered ascertainable

14  loss and damage.

15     117.   Defendants' interference with Plaintiff's prospective economic

16  relations also constitutes a violation of Section 1 of the Sherman Act, as fully

17  alleged in Plaintiff's First Cause of Action.  Thus, Defendants' conduct is

18  independently wrongful.

19                        **FIFTH CAUSE OF ACTION**

20                      **AGAINST DEFENDANTS FOR**

21     **UNFAIR COMPETITION UNDER NEW YORK COMMON LAW**

22     118.   Plaintiff repeats and realleges the allegations of paragraphs 1 through

23  117 as if set forth fully herein.

24     119.   Defendants—motivated by their desire to preclude any competition to

25  Apple Corps' film on iTunes, prevent Plaintiff from gaining any prominence or

26  prestige in any Beatles-related audio-visual media, and control all Beatles-related

27  audio-visual media in the marketplace—engaged in unfair competition by (i)

28  communicating untrue statements designed to injure Plaintiff; (ii) commencing

                                   -21-

baseless litigation the true purpose of which was to cause distributors and exhibitors of the Documentary to refuse to deal with Plaintiff; and (iii) engaging in concerted actions constituting illegal anticompetitive conduct.

120. In conspiracy with and at the insistence of Apple Corps, Sony/ATV communicated false information to Screenvision and the Ziegfeld Theater; namely, that Ace could not exhibit the Documentary without infringing Sony/ATV's copyrights in the Songs.

121. As a result of Defendants' conduct and dishonesty, Screenvision breached the Distribution Contract, the Documentary's exhibition was cancelled, and prospective theatrical and post-theatrical distribution agreements collapsed. Accordingly, Plaintiff suffered significant economic damage.

122. The value of rolling out and presenting the Documentary was reasonably projected to be in the hundreds of millions of dollars.

123. Defendants have obtained commercial benefit through the use of the unlawful conduct described herein, including, for example, by unfairly eliminating competition in the market for Beatles-related audio-visual media.

124. Defendants have received such commercial benefit, fees, and other monies and consideration at the expense of Plaintiff.

125. The amount of such benefits, monies, fees, or consideration due Plaintiff from Defendants cannot be ascertained without an accounting of the income and gross profits that Defendants have obtained through their wrongful conduct. Plaintiff is entitled, therefore, to an accounting.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays judgment against Defendants jointly and severally as stated and for such other and further relief in this Court's discretion as it deems just and proper, including:

1          i.      Actual and compensatory damages and, where applicable,

2    treble, multiple, punitive, and/or other damages, in an amount to be

3    determined at trial, including interest;

4          ii.     An accounting and disgorgement of profits;

5          iii.    Injunctive and declaratory relief;

6          iv.     Costs of suit, including attorneys' fees; and

7          v.      Such further and additional relief as the case may require

8    and the Court may deem just and proper under the circumstances.

9                        **JURY TRIAL DEMANDED**

10        Plaintiff hereby demands a trial by jury on all claims for which a jury trial is

11   authorized.

12   Dated:  June 6, 2013

13                              By:

14                                   Gretchen M. Nelson
                                **KREINDLER & KREINDLER LLP**
                                Gretchen M. Nelson
15                              gnelsen@kreindler.com
                                707 Wilshire Boulevard
16                              Los Angeles, California 90017
                                Telephone: (213) 622-6469
17                              Facsimile: (213) 622-6019

18                              **SQUITIERI & FEARON, LLP**
                                Lee Squitieri
19                              lee@sfclasslaw.com
                                32 East 57th Street, 12th Floor
20                              New York, New York 10022
                                Telephone:  (212) 421-6492
21                              Fax:  (212) 421-6553

22

23

24

25

26

27

28

1

**WEXLER  WALLACE** LLP
Kenneth A. Wexler
Bethany R. Turke
Catherine C. Howlett
kaw@wexlerwallace.com
brt@wexlerwallace.com
ch@wexlerwallace.com
55 West Monroe Street, Suite 3300
Chicago, Illinois 60603
Telephone: (312) 346-2222
Facsimile: (312) 346-0022

2

3

4

5

6

7

*Attorneys for the Plaintiff*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

-24-

**Ace Arts, LLC v. Sony/ATV Music Publishing, LLC, Apple Corps Limited**
**Complaint for Damages and Injunctive Relief**
**TABLE OF EXHIBITS**

| EXHIBIT NUMBER | EXHIBIT DESCRIPTION | PAGE NUMBER |
|----------------|--------------------|-------------|
| A | Distribution Contract | 1 - 18 |
| B | Press Report of Premiere | 19 - 35 |
| C | Karnbach Statement | 36 |
| D | Auction Website/No Copyright Notice | 37 - 38 |
| E | Copyright Research Report | 39 - 46 |

# EXHIBIT A

Complaint for Damages and Injunctive Relief

*Ace Arts, LLC v. Sony/ATV Music Publishing, LLC, et al.*

Execution

## ALTERNATIVE CONTENT AGREEMENT

THIS ALTERNATIVE CONTENT AGREEMENT (the "**Agreement**"), is made as of the ___ day of September, 2011, (the "**Effective Date**"), by and between Screenvision Exhibition, Inc., a Delaware corporation with its principal place of business located at 360 Linden Oaks, Rochester, NY 14625 ("**Screenvision**"), and Ace Arts, LLC, a New York limited liability company with its principal place of business located at 110 Greene Street, New York, NY 10012 ("**Distributor**").

**WHEREAS,** Distributor is in possession of the distribution and exhibition rights to major performing and cultural arts organization events for national theatrical release (the "**Programs**" each a "**Program**"), and Distributor wishes to grant to Screenvision the sole and exclusive rights to distribute and exhibit all such Programs in theatres in the United States and Canada. Distributor shall present each Program to Screenvision along with performing arts company, key performers and other pertinent information for evaluation by Screenvision in its analysis of whether to distribute the Program hereunder;

**WHEREAS,** Distributor and Screenvision desire that Screenvision exhibit the Programs approved by Screenvision in a series of monthly events on certain dates to be mutually agreed by the parties hereto (the "**Exhibition Dates**") at Theatres designated by Screenvision as defined in Section 3.1 below and operated by exhibitors under contract with Screenvision (the "**Exhibitors**"); and

**WHEREAS,** Screenvision is willing to facilitate the exhibition of the Programs approved by Screenvision on the terms and conditions set forth herein, provided, however, Screenvision is under no obligation to exhibit any Program which has not been approved by Screenvision.

**NOW, THEREFORE,** in consideration of the foregoing premises and of the mutual covenants and undertakings herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    **Term.** The initial term of this Agreement shall commence on the Effective Date hereof and shall end on the date that is three (3) years following the earlier of January 1, 2012 or the Exhibition Date of the first Program, subject to the provisions of Section 13 below. The parties may extend this Agreement by mutual written and fully executed agreement. The initial term and extension(s) or renewal term, if any, shall comprise the full term of this Agreement (the "**Term**").

2.    Provision of the Programs.

   2.1.    Operational Guidelines. The Programs shall be prepared and delivered by Distributor in accordance with Screenvision's hardware and technical specifications set forth in **Exhibit A** hereto, as well as scheduling guidelines and other operational guidelines generally in effect for Screenvision's theatre network. Screenvision shall have the right to modify such specifications and guidelines from time to time in the course of its business for the purpose, among others, to ensure compatibility with the Screenvision theatre network and adequate lead time for the processing and distribution of the Programs. Screenvision shall endeavor to notify

Exhibit A - Page 001

Execution

Distributor of such new specifications promptly following the creation thereof. The Programs delivered to Screenvision under this Agreement must conform to the specifications and guidelines; unless otherwise agreed in writing, if the Programs do not conform to the specifications and guidelines it may be subject to additional fees or may be returned by Screenvision.

2.2.   Delivery to Screenvision. Distributor shall deliver the Programs to Screenvision in accordance with the delivery schedule format attached as **Exhibit B** hereto, the specifics of which shall be established by mutual agreement for each Program.

3.   Exhibition of the Programs.

3.1.   Theatres. Screenvision shall make commercially reasonable efforts (i) to have each Program exhibited in at least 300 movie theatres that are located in the United States and Canada whose operators are under contract with Screenvision and/or are willing to exhibit such Program on the applicable Exhibition Date (the **"Theatres"**), and (ii) to suggest two (2) Exhibition Dates for each the Program at the selected Theatre locations.

3.2.   Delivery and Exhibition of Programs. Screenvision shall encode and deliver each Program to the Theatres prior to the applicable Exhibition Date(s) and exhibit each Program or cause each Program to be exhibited at such Theatres on the applicable Exhibition Date(s), all at Screenvision's sole cost and expense.

3.3.   Approvals; Complaints. The Program Spot (as defined below), and poster art designs provided to Screenvision by Distributor for exhibition hereunder shall be subject to the approval of Screenvision (and may be subject to the approval of Exhibitors) in their respective sole reasonable discretion.

4.   **Exclusivity.** Screenvision shall have the exclusive right to exhibit the Screenvision-approved Programs in movie theatres in the United States and Canada from the Effective Date until the expiration of the Term of this Agreement. Distributor shall not license, distribute, rent or sell each Program in the United States and Canada in DVD format or via video on demand or otherwise license or allow the broadcast, showing, exhibition or sale of such Program in any medium or by any device, including broadcast, satellite and cable television, movie theatres, internet, mobile phone, display or recording format during the period from the first Exhibition Date of the applicable Program through the ninetieth (90th) day following the first Exhibition Date therefor. Initially, Distributor shall present to Screenvision the Programs on **Exhibit D** or such other Programs as are mutually agreed between the parties. Thereafter, Distributor shall present no less than eight (8) Programs per "Annual Period," defined herein as each consecutive twelve (12) month period during the Term beginning on January 1, 2012.

5.   Gross Box Office; Delivery and Marketing Costs.

5.1.   Definitions.

(a)   **"Gross Box Office"** shall mean all monies received by Exhibitors for the privilege of admission to the Theatre screen auditorium during the exhibition of the Programs therein, regardless of when or where paid, net of admission taxes required by

-2-

7920172v5

Exhibit A - Page 002

Execution

law to be collected from the patrons, refunds and virtual print fees (if applicable) that Exhibitors are obligated to pay to the digital projection vendor due to the exhibition of the Programs. Suggested ticket price shall be determined on a Program-by-Program basis, but in any event shall not be lower than standard movie ticket prices with consideration for student, senior and special membership discounts or higher than $20.00.

      (b)    **"Net Box Office"** shall mean Gross Box Office after retention of Exhibitors' percentage of revenue and the deductions set forth in subparagraph 5.1(a) above.

      (c)    **"Ancillary Revenue"** shall mean all gross revenue earned by Distributor in connection with the exploitation of the Programs in the United States and Canada during the Term of this Agreement (including but not limited to synchronization fees, advertisement and sponsorship revenue, syndication income, pay-per-view, home video, merchandising, sound track albums etc.) other than Distributor's share of Net Box Office, less Distributor's actual, out-of-pocket costs associated solely with the collection of such gross revenue in the United States and Canada (for the avoidance of doubt, no production, marketing or promotional costs may be deducted from gross revenue in performing this calculation). For the purposes of determining Screenvision's share of Ancillary Revenue, Distributor's costs paid in connection with the collection of gross revenue shall be capped at twenty percent (20%) of such gross revenue.

    5.2.    <u>Split of Box Office Receipts</u>. Net Box Office shall be split in the following amounts and order after the receipt of box office data and revenue on a Program-by-Program basis:

      (a)    Exhibitors' percentage of Gross Box Office shall be negotiated in good faith between Screenvision and the Exhibitors, provided that Screenvision shall make commercially reasonable efforts to limit the Exhibitor share of Gross Box Office to fifty percent (50%). A share to the Exhibitor of sixty (60%) or more shall be subject to the prior approval of the Distributor;

      (b)    Screenvision shall receive the first $40,000 of Net Box Office following payment of Exhibitors' percentage;

      (c)    Distributor shall receive the next $40,000 of Net Box Office following the payment to Screenvision in Section 5(b) above; and

      (d)    The remainder of Net Box Office shall be split seventy-five percent (75%) to Distributor and twenty-five percent (25%) to Screenvision;

    5.3.    <u>Split of Ancillary Revenue</u>. Ancillary Revenue shall be split seventy-five percent (75%) to Distributor and twenty-five percent (25%) to Screenvision.

    5.4.    Screenvision may, but is not obligated to, carry out periodic reviews of the financial success of Programs hereunder at the end of any twelve (12) month period commencing January 1, 2012 to December 31, 2012. If Net Box Office has exceeded $1.2 million in the prior twelve (12)-month period, then commencing with the first day of the month following date of

Exhibit A - Page 003

Execution

Screenvision's review and continuing thereafter throughout the balance of the Term, the split of Net Box Office set forth in paragraph 5.2(d) above, shall be sixty percent (60%) to Distributor and forty percent (40%) to Screenvision.

6.    <u>Reports and Payment</u>.

6.1.    <u>Screenvision Obligations</u>. Screenvision shall make commercially reasonable efforts to provide initial box office numbers with respect to the exhibition of each Program to Distributor within fifteen (15) business days of the last day on which the applicable Program is exhibited. Screenvision shall pay Distributor its share of Net Box Office for exhibition of each Program and provide box office reports within forty-five (45) days after the last day on which the applicable Program is exhibited, subject to a final reconciliation following Screenvision's receipt of final payment and box office numbers from Exhibitors. Distributor shall be deemed to have consented to and be bound by any accountings rendered by Screenvision unless an objection is made in writing within six (6) months after the date rendered, and, after such written objection, unless a lawsuit is commenced within one (1) year thereafter.

6.2.    <u>Distributor Obligations</u>. Screenvision's share of Ancillary Revenue shall be paid by Distributor on a quarterly basis. Within fifteen (15) business days after each calendar quarter during which the Ancillary Revenue was generated, Distributor shall furnish Screenvision with a complete statement showing the gross revenue generated during such period, and detailing all deductions therefrom. For a period of three (3) years following the rendition of a particular accounting statement, Distributor shall keep and maintain records of all transactions relating to or affecting such statement. Upon seven (7) days written notice, such records shall be open for inspection by Screenvision or Screenvision's duly authorized representative during normal business hours. Screenvision shall be deemed to have consented to and be bound by any accountings rendered by Distributor unless an objection is made in writing within two (2) years after the date rendered, and, after such written objection, unless a lawsuit is commenced within one (1) year thereafter.

7.    <u>Marketing Activities and Costs</u>.

7.1.    <u>Distributor Marketing</u>. Distributor shall provide the marketing activities set forth in **Exhibit C** hereto in support of the exhibition of the first Program hereunder which shall be deemed incorporated in this Agreement. The parties acknowledge that each subsequent Program will entail the core marketing activities in **Exhibit C** save they may contain additional obligations which once mutually agreed shall be embodied in an exhibit which shall be attached as an additional **Exhibit C** and deemed incorporated in this Agreement.

7.2.    <u>Distributor Deliverables</u>. Distributor shall design and produce, with Screenvision's input the following promotional items (collectively, **"Promotional Content"**):

(a)    a thirty second (0:30) spot promoting the Program event (**"Program Spot"**);

(b)    poster art designs; and

-4-

Exhibit A - Page 004

Execution

    (c)    web banners.

Distributor shall deliver the initial version of the Program Spot and advertising and poster art designs for Screenvision review and the final versions of each in accordance with the form schedule set forth in **Exhibit B** hereto. All advertising, marketing and promotional materials relating to the exhibition of each Program hereunder shall be subject to mutual agreement of the parties, such approval not to be unreasonably withheld or delayed.

    7.3    <u>Screenvision Marketing</u>.  Screenvision shall provide the following marketing activities in support of the exhibition of each Program:

    (a)    exhibit the Program Spot beginning approximately four weeks before the applicable Exhibition Date(s) during the Screenvision pre-show on Exhibitors' screens and on screens of other consenting Theatres;

    (b)    create and maintain a dedicated webpage promoting the exhibition of each Program which shall allow advance ticketing and include the logos of sponsors, the design of which Screenvision shall share with Distributor for approval, not to be unreasonably withheld or delayed, prior to the webpage going live on the internet;

    (c)    web-based marketing, including a minimum of two (2) email blasts from participating Exhibitors (where available);

    (d)    position Program information on the web sites of participating Exhibitors (where available); and

    (e)    coordinate printing and delivery of film posters, if any, at Exhibitor locations and Exhibitor compliance with distribution requirements, such as the display of posters, the sending of email blasts, and positioning on Exhibitor website, where available.

Screenvision's performance is dependent on Distributor's compliance with the form and timing of the delivery schedule set forth in **Exhibit B** hereto. The parties acknowledge that each Program after the first Program hereunder will entail different scheduling requirements, which, once mutually agreed, shall be embodied in an exhibit and attached as an additional **Exhibit B** and deemed incorporated in this Agreement.

    7.4    <u>Public Relations</u>.

    (a)    Screenvision's marketing department will work jointly with Distributor to create and distribute a press release to announce the exhibition of each Program, targeted to both trade and consumer press. Sponsors, if any, shall be included in all releases.

    (b)    All press releases and other publicity materials relating to the exhibition of any Program hereunder shall be subject to mutual agreement of the parties, such approval not to be unreasonably withheld or delayed.

7920172v5

Exhibit A - Page 005

Execution

8.   Representations, Warranties and Covenants.

8.1   Distributor's Representations, Warranties and Covenants.  Distributor represents and warrants (and, where applicable, covenants) to Screenvision that:

(a)   Distributor is a duly organized limited liability company, validly existing and in good standing under the laws of its state of organization; its execution, delivery and performance of this Agreement has been properly authorized by all necessary action, corporate or other; it has the power, authority, approvals and consents necessary to execute and deliver this Agreement and perform or cause to be performed all of its obligations hereunder.

(b)   Distributor owns or has the right to permit the use of the Programs as set forth in this Agreement, including, but not limited to the exclusive rights to duplication, distribution and exhibition of the Programs at movie theatres as contemplated in Section 3 hereof.

(c)   The Programs and their use as contemplated by this Agreement will not infringe on the rights of any third party (including, without limitation, copyright, trademark, and other intellectual property rights, or rights of privacy or publicity) or violate any foreign or domestic federal, state or local law or regulation.  Neither Screenvision nor the Exhibitors will have any obligation to make any payment for the rights granted by Distributor hereunder except as set forth in this Agreement.

(d)   Distributor will prepare, deliver and/or file all reports, returns, notices or other documents required under any law, statute, union agreement, ordinance, rule or agreement to be prepared, delivered and/or filed by a distributor of a movie film to any governmental, quasi-governmental or private entity with respect to the Programs and/or the exhibition and other exploitation thereof.

(e)   Prior to delivery of the Programs, Distributor or its licensor or assignor will have obtained from all parties rendering services or furnishing materials, facilities or rights in connection with the Programs, the right (without condition or limitation) during the periods of promotion and of exhibition of the Programs, to use: (i) the title of each Program, (ii) the name and logo of the owner of each Program, (iii) any related trademarks and/or other marks used by such owner in connection with each Program and (iv) the name, voice, approved likeness and approved biographical material with respect to individuals appearing in or the subject(s) of the Programs and all music included in the Programs, in any screen capture, clips, trailers, content segments, other on-screen advertising and/or promotional and ancillary marketing of Programs, including but not limited to any such activities at theatres as contemplated in Section 3 hereof.

(f)   This Agreement constitutes Distributor's legal, valid and binding obligation, enforceable against it in accordance with the terms hereof, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws relating to or affecting the enforcement of creditors' rights generally,

-6-

7920172v5

Exhibit A - Page 006

Execution

and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

8.2.    Screenvision's Representations and Warranties.  Screenvision represents and warrants to Distributor that:

(a)    It is a duly organized corporation, validly existing and in good standing under the laws of the State of Delaware; the execution, delivery and performance of this Agreement has been properly authorized by all necessary action, corporate or other; it has the corporate power, authority, approvals and consents necessary to execute and deliver this Agreement and perform or cause to be performed all of its obligations hereunder.

(b)    This Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with the terms hereof, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer or other similar laws relating to or affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether considered in a proceeding in equity or at law).

8.3.    Exclusion of Warranties.  Except as specifically provided in this Section 8, neither Screenvision nor Distributor makes any warranties of any kind, whether express or implied, including, without limitation, any implied warranty of merchantability or fitness for a particular purpose.

9.    Indemnity.

9.1.    Distributor Indemnification of Screenvision.  Distributor shall indemnify, defend and hold harmless Screenvision, its affiliates, sub-contractors, vendors, Exhibitors, Theatres or theatre managers, and its and their officers, directors, shareholders and employees, from and against any claim, liability, loss, damage, cost or expense, including reasonable outside counsel attorneys fees and expenses, related to or arising out of or in connection with:

(a)    the Programs provided to Screenvision by Distributor hereunder and their exhibition at movie theatres and all authorized uses related thereto, including, without limitation, (i) the actual or alleged infringement by any Program (including, but not limited to, through the creation, distribution or exhibition thereof) of any trademark, copyright or other intellectual property right, or (ii) violation by any Program of rights of privacy or publicity or of any foreign or domestic federal, state or local law or regulation; and

(b)    any breach by Distributor or any of its affiliates, assignees, and/or subcontractors of any of Distributor's obligations, covenants, representations or warranties contained in this Agreement.

Distributor shall cause Screenvision and each Exhibitor exhibiting any Program to be added as a third party beneficiary of any indemnity granted to Distributor or any of its affiliates under the terms of its agreements with owners of any or all of the rights in any Program or, if such addition

-7-

Execution

is not practicable, shall assert such indemnities on behalf of Screenvision and the Exhibitors in furtherance of the foregoing indemnity under this Section 9.

9.2.   Screenvision Indemnification of Distributor.   Screenvision shall indemnify, defend and hold harmless Distributor, its affiliates, and subcontractors and their officers, directors, shareholders and employees, from and against any third party claim, liability, loss, damage, cost or expense, including reasonable outside counsel attorneys' fees and expenses, related to or arising out of or in connection with any breach by Screenvision, or any of its affiliates, assignees, and/or subcontractors of any of Screenvision's obligations, covenants, representations or warranties contained in this Agreement, provided the claim is reduced to a final, non-appealable judgment or settled with Screenvision's prior written consent.

9.3.   Notification of Right to Indemnification.   A party entitled to the benefit of an indemnity hereunder must notify the indemnifying party in writing within a reasonable time of notice thereof of any matter of which it has notice and for which it seeks indemnity provided that any failure to provide such timely notice shall not relieve the other party of its obligations under this Section except to the extent actually prejudiced and permit the indemnifying party to select legal counsel to defend that matter at the sole cost and expense of the indemnifying party and cooperate with the indemnifying party and its legal counsel in that defense. The indemnifying party shall not settle any such claim or demand without the prior consent of the indemnified party or compromise any claim or consent to the entry of any judgment unless such compromise or judgment includes an unconditional release of the indemnified party for all of such indemnified party's liability for the matter.

10.   Limitation of Liability.

10.1.   Screenvision limitation.   Screenvision shall have no liability arising out of (i) any failure by or any act of an Exhibitor or theatre that disrupts or prevents the display of the Programs; (ii) any failure or disruption in the delivery of the Programs caused in any way by telephone systems, wireless and/or satellite services or any related third party service providers; (iii) any failure of transmission facilities or any third party equipment. Screenvision shall have no liability for any unauthorized access to the system or for any related alteration, theft, loss or destruction of the Programs and/or Distributor's or any third party's content, network, systems, applications, data or information whether caused by accident, fraudulent means or devices or other illegal method.

10.2.   General limitation.   In no event shall either party be liable under this Agreement for incidental, special, indirect and/or consequential damages, even if such damages are foreseeable and whether or not such party has been advised of the possibility thereof.

11.   Insurance.   Distributor shall (a) obtain and maintain at its sole expense during the Term insurance customary for producers and distributors of filmed content, including but not limited to general liability, and errors and omissions, and worker's compensation insurance, in connection with the Programs, all of which such insurance shall be from insurance companies having a Best rating of A- or better, shall be without exclusions other than exclusions customary for producers and distributors of filmed content, shall name Screenvision as an additional insured, shall have policy limits of at least $1,000,000 per occurrence/$3,000,000 aggregate and shall have a

7920172v5

Exhibit A - Page 008

Execution

deductible no greater than $25,000 and (b) cause the content provider thereof to name Screenvision as an additional insured on such content provider's errors and omissions insurance (including title coverage). Distributor shall furnish to Screenvision certificates naming Screenvision as an additional insured with respect thereto. Such Distributor insurance shall be primary with respect to any other insurance maintained by Distributor and shall provide for thirty (30) days' written notice to be given to Screenvision before any cancellation or material change in such insurance.

**12.** **Right to Suspend Content Services and Distribution.** Screenvision reserves the right to suspend working on, distributing or exhibiting all or any portion of the Programs for which Screenvision receives a demand or claim or for which an Exhibitor has informed Screenvision of its objection to the delivery or exhibition of the Programs.

**13.** Termination/Default.

    (a) The Term of this Agreement may be terminated by Screenvision on thirty (30) days notice to Distributor for:

        (i)     lack of Exhibitor commitment to upcoming Program(s);

        (ii)    consistently poor production values in Programs proposed to be exhibited hereunder;

        (iii)   submission of Programs which do not embody the performance of major world class talent;

        (iv)   lack of marketing commitment by Distributor intended to drive attendance to the theatrical exhibitions;

        (v)    box-office revenue generation which is insufficient to meet Screenvision's receipt of payment in full under 5.2 (b) for any one Program.

If the Term is terminated by Screenvision pursuant to this Section 13(a) by reason of a Program which has not yet been exhibited, and another Program(s) is then being exhibited, the parties shall continue their marketing efforts for the then-current Program(s) and shall be entitled to each party's respective share of income generated during the Term and extending for a period of ninety (90) days after the last date of exhibition of each applicable Program.

    (b) Distributor or Screenvision, as the case may be, shall be in default in the event that (a) (i) it makes an assignment for the benefit of creditors; (ii) it admits in writing its inability to pay debts as they mature; (iii) a trustee or receiver is appointed for a substantial part of the other party's assets; or (iv) to the extent termination is enforceable under the U.S. Bankruptcy Code, a proceeding in bankruptcy is instituted by or against it, which is not dismissed within thirty (30) days, or which results in an adjudication of bankruptcy; or (b) it materially breaches this Agreement and that breach is not remedied within thirty (30) calendar days of notice in writing from the other party requiring that it be remedied. Upon such event of default (after any applicable notice or cure periods), the non-defaulting party shall be entitled to terminate this Agreement immediately upon written notice to the defaulting party. Such termination shall not

7920172v5

Exhibit A - Page 009

release the defaulting party from its indemnification obligations hereunder or from any damages sustained by the non-defaulting party as a result of such default.

**14. Force Majeure.** Neither Screenvision nor Distributor shall be deemed to be in material breach of this Agreement, or otherwise be liable to the other, by reason of any delay in performance or nonperformance of any of its obligations, other than the payment of money, hereunder, occurring as a result of any cause beyond its reasonable control or remedy.

**15. Assignment and Subcontracting.** This Agreement may be assigned in whole or in part by either party to any entity which succeeds to all or substantially all of the assets or business of the transferring party or to any entity with which the assigning party is merged or consolidated, but Distributor may not otherwise assign this Agreement, in whole or in part, without the prior written consent of Screenvision, not to be unreasonably withheld or delayed. Any such purported assignment shall be null and void. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective permitted successors and assigns. Screenvision may subcontract production, transmission, exhibition, advertising, sales and fulfillment activities to third parties.

**16. Confidentiality.** "Confidential Information" of a party means information concerning the business or financing of such party, its subcontractors or affiliates disclosed to the other party, including, without limitation, its business methods, finances, prices, customer lists, computer systems, software and know-how; provided, however, that Confidential Information of a party shall not include information which: (i) at the time of disclosure or thereafter is generally available to or known by the public other than as a result of a disclosure by the receiving party or its representatives; (ii) was available to the receiving party on a non-confidential basis from a source other than the disclosing party, which source (after reasonable diligence) is not known to the receiving party to be bound by a duty not to disclose such information; or (iii) was otherwise independently acquired or developed by the receiving party without violating its obligations hereunder. The provisions of this Agreement shall be considered the Confidential Information of the parties hereto. Each of Screenvision and Distributor (on its behalf and on behalf of its subcontractors, employees or representatives) agrees to hold and treat all Confidential Information of the other party in confidence, shall use such Confidential Information only in connection with such party's exercise of its rights and performance of its obligations hereunder and shall not, without the prior written consent of the other party, disclose any of such other party's Confidential Information except (a) disclosure by the receiving party to its directors, officers, employees, accountants, lending institutions, agents, attorneys and representatives on a need-to-know basis; and (b) as may be required by law, applicable regulation or judicial process; provided, however, that if the receiving party is required to disclose such Confidential Information by applicable law, regulation or legal process, the receiving party shall promptly notify the disclosing party of such pending disclosure and consult with the disclosing party prior to such disclosure as to the advisability of seeking a protective order or other means of preserving the confidentiality of the Confidential Information. The obligations set forth in this Section 16 shall survive for two (2) years following any termination or expiration of this Agreement.

17. **Notices.** Any notice, request, consent, reply or advice, approval, waiver or other communication hereunder (each a "Notice"), except as otherwise specifically provided, shall

-10-

7920172v5

only be deemed to have been given if the same is in writing and is served personally, mailed by certified U.S. mail, return receipt requested, or if sent by a nationally recognized commercial overnight delivery service (including but not limited to Federal Express, Airborne Express, or United Parcel Service) which provides proof of delivery, addressed to Screenvision (with copy to Screenvision's SVP & General Counsel) or Distributor (with copy to Pelosi, Wolf, Effran & Spate, The Woolworth Building, 233 Broadway, Suite 2208, New York, NY 10279, attention Jaime Wolf, Esq. at the address listed above or at such other addresses that the parties may designate in accordance with this Section 17.

**18.     Choice of Law and Arbitration.**  This Agreement shall be governed by the laws of the State of New York without giving effect to any conflict of laws principles (except Section 5-1401 of the New York General Obligations Law). The parties hereby agree to submit all disputes relating to or arising out of this Agreement to arbitration before a single arbitrator in New York, New York pursuant to the Commercial Arbitration Rules of the American Arbitration Association as then in effect, and each party hereto waives any and all rights to injunctive or other equitable relief. The decision of the arbitrator shall be final and binding. Judgment on the arbitrator's award may be entered in any court having jurisdiction thereof. The prevailing party in any such arbitration shall be entitled to recover costs, including reasonable outside counsel attorneys' fees. In the event an arbitral proceeding is commenced hereunder and a separate arbitral proceeding is commenced under an agreement between Screenvision and an Exhibitor or an advertiser involving some common facts and circumstances, at Screenvision's election such proceedings may be joined into a single arbitral proceeding.

**19.     No Third Party Beneficiaries; No Joint Venture.**  None of the terms or provisions of this Agreement shall be deemed to create a partnership, joint venture or other joint enterprise between or among the parties and/or any other person. This Agreement is not intended to nor shall it be construed to create any third-party beneficiary rights in any person(s) other than the parties hereto unless expressly otherwise provided herein.

**20.     Releases and Waivers.**  Rights and remedies in relation to this Agreement are cumulative and those set forth in this Agreement are in addition to any rights and remedies under general law or otherwise. No release, waiver or postponement shall be binding upon a party unless set forth in writing and signed on behalf of such party.

**21.     Miscellaneous.**  The language herein shall in all cases be construed simply, according to its fair meaning, and not strictly for or against any party hereto, and there shall be no presumption against either Screenvision or Distributor on the ground that it was responsible for drafting this Agreement or any part hereof.  If any provision of this Agreement shall be found to be invalid, illegal, or unenforceable, in whole or in part, neither the validity of the remaining part of such provision or the validity of any other provision shall be in any way affected thereby. The provisions of Sections 9 (Indemnity) and 10 (Limitation of Liability) and any other sections which require payments to be made and obligations to be performed subsequent to the expiration or termination of the Term of this Agreement shall survive the expiration or termination of the Term of this Agreement until the expiration of the applicable statute of limitations. This Agreement, together with the Exhibits hereto constitute and set forth the entire agreement between the parties hereto with respect to the subject matter hereof, and supersede all prior agreements between the parties, whether written or oral, with respect hereto. Each party

Exhibit A - Page 011

Execution

acknowledges that it has entered into this Agreement relying only on the matters expressly set forth in this Agreement. No purported amendment to this Agreement shall be effective unless it is in writing and signed by both parties. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but which together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first above written.

ACE ARTS, LLC                           SCREENVISION EXHIBITION, INC.


By: _____       By: _____
    Name:                                 Name:
    Title:                                Title:
    Date:                                 Date:

7920172v5

Exhibit A - Page 012

Execution

## Exhibit A

### Technical Specifications

High Definition
FOR SPOTS AND LONG-FORM CONTENT PIECES

**Tape Format:**

- Panasonic HD Cam SR, D5, drive or Uncompressed QuickTime
- *HD Cam SR is preferred tape format

**Recording Format:**

- 1280 X 720P/59.94 FPS

**Image Format:**

- 16:9

**Audio:**

- Stereo – CH1=LT, CH2=RT
- Dolby 5.1 – CH1=L, CH2=R, CH3=C, CH4-Sub, CH5=LS, CH6=RS, CH7=LT, CH8=RT
- IMPORTANT – 5.1 audio mix must include LT/RT on CH7 and CH8

**Audio Levels:**

- -20 dbfs reference level
- 5.1 Sound is not a requirement; Stereo-only spots are accepted.
- Audio should be mixed for an average sound level of 82-84 db for spots within our LPS/Premium Pod and 78 db within our EPS in the theatre at standard reference levels. An increase of 4-8 dbfs for the surround channels is suggested.

**Title Safe & Image Safe Area:**

- 5% from edges of image, Title Safe Area 10% from edges of image

Exhibit A - Page 013

Execution

## Exhibit B

### Form of

### Delivery and Exhibition Schedule

### [Programs Title]

| | |
|---|---|
| Delivery of initial 0:30 Programs Spot and poster art to Screenvision | [DATE] |
| Delivery of FINAL 0:30 Programs Spot and poster art to Screenvision | [DATE] |
| Commencement of Exhibition of 0:30 Programs Spot in Screenvision pre-show | [DATE] |
| Delivery of final master of Picture to Screenvision | [DATE] |
| Exhibition Date(s) | [DATE] |

Exhibit A - Page 014

Exhibit C

Marketing Plan

1. Monthly email newsletters provided by Patron Technology to performing arts not-for-profit clients, up to 18 million US arts fans per month. Media value per month: $180,000.

    SAMPLE PATRON TECHNOLOGY NEWSLETTER CLIENTS:
    Annapolis Symphony Orchestra; Florida Grand Opera; Glimmerglass opera; Kansas City Symphony; New York Philharmonic; Oakland East Bay Symphony; Orchestra of St Luke's; Cleveland Orchestra;
    Anchorage Museum of History and Art; American Folk Art Museum; Denver Art Museum; Los Angeles County Museum of Art;
    Arts NY State; Edmonds Center for the Arts; Mann Center for the Performing Arts; Pittsburgh Cultural Trust; Quick Center for the Arts; Lincoln Center Theater; Shakespeare Theater of New Jersey; Seattle Repertory Theater; Capital repertory Theater; Berkeley Repertory Theater;
    Alvin Ailey Dance Foundation; Dance NYC; Mark Morris Dance Group; Merce Cunningham Dance Company; Atlanta Ballet; Paul Taylor Dance Company; Clearview Cinemas; American Symphony Orchestra League; Chamber Music America; National Corporate Theater Fund; The Book Report Network.

2. Banner ads on classicaltv.com. This site is carried on the Google TV and Roku box (1.5m homes), on the Tremor Media and Martini Media networks of websites (65 million uniques/moth, 24.2 million of them arts and culture lovers). Media value per month: $620,000.

    SAMPLE MARTINI MEDIA NETWORK WEBSITES (including some non-arts sites with similar demographics):
    Art Ltd; Uinterview; Inspired Economist; Art Fact; My Modern Metropolis; Home Away; The Travel Insider; Lawyers.com; The Banking Journal; Digital Journal; Wine Review Online; Fork and Bottle; Chef Talk; Architizer; Fashionism; Styleite.

3. Print advertising as appropriate. Probable choices include National Playbill Magazine, Showbill and/or National Classic Arts (aggregate circulation 4,094,000 per month). Aggregate media value per month: $44,000.

    PLAYBILL DISTRIBUTION:
    New York, Midwest, Mid-Atlantic, West, Southeast, South Central and New England markets including the cities of New York, Philadelphia, Baltimore, Washington DC, Boston, Miami, Ft Lauderdale, Palm Beach, Orlando, Dallas, Houston, San Antonio, New Orleans, Chicago, Cincinnati,

Exhibit A - Page 015

Columbus, St Louis, Kansas City, Minneapolis, Indianapolis, Los Angeles, San Francisco, San Diego, Las Vegas, Tempe.

4.   Radio advertising if required.  Ten major area classical radio stations such as WNYC-FM (audience figures unavailable as dependent on slots and stations).  <u>Media value per month: $14,500</u>.

5.   Purchasing of mailing lists as necessary to plug any holes evident in the national coverage of the Patron lists or for extra ballet/dance advertising of Bolshoi events.  <u>Media value: estimated $5,000</u>.

Exhibit A - Page 016

## Exhibit D

### Programming

| Period | Performer/Producer | Production |
|---|---|---|
| January 2012 | Netrebko, Kaufman and Schott | 3 Superstars in Berlin |
| March 2012 | Lincoln Center | South Pacific |
| June 2012 | Iambic Media Ltd | Evita |
| December 2012 | Mariinsky Ballet | Nutcracker |

7920172v4

Exhibit A - Page 017

<u>AMENDMENT</u>

AMENDMENT made and entered into as of January 13, 2012 by and between **ACE ARTS, LLC** ("Distributor"),110 Greene Street, New York, New York 10012 - and - **SCREENVISION EXHIBITION, INC.** ("Screenvision"), 360 Linden Oaks, Rochester, New York 14625 with reference to the following facts:

      A.    Distributor entered into that certain alternative content agreement dated as of September 27, 2011 with Screenvision (the "Agreement").

      B.    Distributor and Screenvision each desire to amend the terms of the Agreement on the terms and conditions set forth herein.

      NOW, THEREFORE, in consideration of the mutual promises and covenants contained herein, it is agreed as follows:

1.    All capitalized terms which are not defined in this amendment are deemed to be as defined in the Agreement.

2.    The parties agree that the Program may be exhibited by MediaCast Holdings, LLC, d/b/a "Specticast" in institutional auditoria such as those in senior centers, community centers and educational institutions, as well as auditoria in performing arts centers and independent theatres; and each auditorium in which the Program is exhibited shall be deemed a Theatre for purposes of the Agreement.  Proceeds from the foregoing exhibitions shall be deemed Gross Box Office under the Agreement.

3.    Except as specifically modified herein, the Agreement remains in full force and effect, is binding by its terms, and is hereby ratified and confirmed as though set forth at length herein.

WITNESS, the due execution hereof.


          Screenvision Exhibition, Inc.


          By: _____
          Name: Darryl Schaffer
          Its: EVP Operations and Exhibitor Relations

**Ace Arts, LLC**


By: _____
Name: Susan Wittenberg
**Its: President**

Exhibit A - Page 018

# EXHIBIT B

Complaint for Damages and Injunctive Relief

*Ace Arts, LLC v. Sony/ATV Music Publishing, LLC, et al.*

Print Post - Deadline.com Deadline.com



## 'The Beatles: The Lost Concert' Docu Gets May 17 & 22 Release Dates

By THE DEADLINE TEAM



Screenvision, in partnership with Ace Arts, and multiple-award winning music documentary producer Iambic Media, brings one of the music world's true "lost treasures" to the big screen with the feature presentation of "The Beatles: The Lost Concert." The new 92-minute documentary charts the birth and impact of Beatlemania in America and includes, in its entirety, their first-ever full U.S. concert performance from February 11, 1964 at D.C.'s Washington Coliseum, the only complete Beatles' concert available to fans, one which has remained unseen by movie theater audiences across the nation for over 47 years. Rock superstar and American Idol judge Steven Tyler commented: "This blows away every performance I've ever seen, including Elvis!"

The story of their historic arrival in America and the impact they had is revealed through new interviews with more than 20 Beatles' associates, journalists, disc jockeys, concert attendees, historians and music luminaries and archival footage of the Fab Four. The list includes Aerosmith's Steven Tyler and Joe Perry, rock pioneer Chuck Berry, super producer Mark Ronson, journalists Maureen Cleave, Larry Kane and Ed Rudy, concert promoter Sid Bernstein, Beatle George's sister Louise Harrison, The Strokes' Albert Hammond Jr. and Nick Valensi, chart-topping U.K. songstress Duffy, renowned Beatles historian Bruce Spizer, and Mike Mitchell, whose recently unearthed photos of the event are seen throughout the movie.

On February 11, 1964, two days after their record shattering appearance on "The Ed Sullivan Show," The Beatles traveled by train through a snowstorm to Washington, D.C. to perform their first-ever before an American audience at The Washington Coliseum, before an overbooked audience of 8,092 screaming (mostly female) teenagers. Their 12-song set that lasted a little over a half-hour and included both chart-topping originals like "She Loves You" and high-energy covers like "Twist and Shout." Professionally filmed by an eight-camera crew and mixed live on location, the show was broadcast a month later via closed-circuit to movie theaters across America to two million teenagers. The film of the concert was then lost and remained unseen in its entirety by audiences for over 47 years! The original master tapes have now been restored and re-mastered and the entire concert, the ONLY complete Beatles concert available to fans, is included in The Beatles: The Lost Concert.

Sure to rekindle the fires of Beatlemania for both the generation who lived it and the younger ones influenced by it, the event will be shown in movie theaters across the U.S. in a limited engagement on May 17 and 22, 2012. In addition, a special World Premiere is scheduled at New York's landmark Ziegfeld Theater on May 6 with two showings. For information, including detailed history, movie trailer and tickets, go to

The resonating impact of the Beatles' in performance is illustrated in the raves given in interviews during the documentary. Commenting on them as musical competition for all who came in their wake, Mark Ronson, the producer behind hits from Amy Winehouse and Adele, adds: "You're always going to be standing in the shadow of The Beatles." U.K. pop sensation Duffy calls them "the Holy Grail of music," while Mike Mitchell, the young photographer who chronicled the show, adds: "The concert was like being in the delivery room at the birth of an entire generation." Tommy Roe, one of their opening acts that evening may have put it best: "This is history!"

Print Post - Deadline.com Deadline.com                                  Page 2 of 2

This article was printed from http://www.deadline.com/2012/04/the-beatles-the-lost-concert-documentary-gets-may-17-release-date/

Exhibit B - Page 020



## ENTERTAINMENT

# 'The Beatles: The Lost Concert' Documentary Will Include Footage From First US Concert

04/24/12 01:32 PM ET AP



The Beatles in their prime.

NEW YORK -- The Beatles are hitting theaters nationwide.

Recently discovered footage of the Fab Four's first full-length concert in the United States is the subject of a new documentary, "The Beatles: The Lost Concert."

Recorded at Washington Coliseum on February 1964 to an overbooked teenage audience of 8,000 screaming fans, the 12-song set included "She Loves You" and "I Saw Her Standing There." The show came just two days after the group's landmark appearance on "The Ed Sullivan Show."

The documentary covers the band's historic arrival in America and includes new interviews with Steven Tyler, Chuck Berry, Mark Ronson, and others.

The film's world premiere is scheduled at New York's Ziegfield Theatre on May 6, and will be in 450 theaters nationwide on May 17 and 22.



FOLLOW US        LOGIN  REGISTER        Search        ≈74°

Search

FOLLOW US                                        LOGIN | REGISTER

Home    Music    On Air    Photos    Events    Contests    Video    Playlist


Lookin' hungry, friend.    Order Food Now ›    grubHub·

# The Beatles: The Lost Concert [Watch]

April 25, 2012 10:40 AM

Like   0            View Comments



(Photo: AFP/Getty Images)

Two days after their historic performance on *The Ed Sullivan Show*, The Beatles performed their first U.S. concert at the Washington Coliseum. Cheap seats went for $2, with the better ones commanding $4. Over 8,000 fans packed into the venue by the time the band took the stage to perform "Roll Over Beethoven."

**Filed Under**

Archive

**Related Tags**

1964, 1968, Concerts, documentaries, Ed Sullivan Show, george harrison, John Lennon, Movies, Paul McCartney, ringo starr, The Beatles

Concerts were banned at the facility after a riot broke out during a performance by The Temptations a few years later, and today, the Coliseum is gone, replaced by an indoor parking lot.

Footage of the entire concert was recently found. You'll be able to see every song in *The Beatles: The Lost Concert*. The film is set to premiere in New York City at the Ziegfeld Theater May 4, and will be screened at over 400 theaters nationwide May 17 and May 22.

"The early stages of Beatlemania are evident in every frame. Generations will view it, analyze it, comment on it and all will reach the conclusion that a moment like this will never be repeated."

Among those interviewed in "The Lost Concert" are Chuck Berry, Steven Tyler and Joe Perry from Aerosmith, The Strokes, and fans who were actually there that night February 11, 1964.

Classic rock author and WZLX host Carter Alan says this is an important piece of music history: "The first Beatles tour was just a short promotional visit of days, so this is a snapshot as valuable as Elvis's '68 'black leather' comeback special or James Brown at the Apollo."

The official trailer was just released. Take a look!




◆HUSKY·

$29⁹⁶

EXCLUSIVE HUSKY®
26 PC. SCREWDRIVER SET


CBS Chicago



DEAL OF THE DAY
Up to 90% off at Trips Incentives Florida Escape

See more Deals for CBS Chicago

Get CBS Chicago Deal Alerts by email

Enter email address here

## FOLLOW WXRT

93XRT
Like · 47,867

Follow @93XRT  30.4K followers



FOLLOW US          LOGIN

Here's a list of theaters showing the film:

Sponsored Links



Car Sharing New York
Find Zipcars in New York. Get $75 Free Driving. Join Today.
zipcar.com

BlackBerry® 10
Find out more about the new BlackBerry 10 smartphone.
BlackBerry.com/BlackBerry-Z10

Weird but easy
Use this simple trick to collect silver from practically any bank
standardnews.search.com

LifeLock® Fraud Services
24/7 Credit Fraud Monitor...
LifeLock.com

One Wrinkle Trick
Wrinkle Solution Horrifies Surgeons. Her Skin is About...
www.stayyoothbeauty.com

Buy a link here

Illinois

SAVOY 16, 232 WEST BURWASH, SAVOY, Illinois 61874

KENDALL 10, 96 FIFTH ST., OSWEGO, Illinois 60543-

O'FALLON 15 CINE, 1320 CENTRAL PARK DRIVE, O'FALLON, Illinois 62269-

GURNEE CINEMAS, 6144 GRAND AVE., GURNEE, Illinois 60031-

ADDISON CINEMAS, 1555 WEST LAKE STREET, ADDISON, Illinois 60101-

ROSEMONT 18, 9701 BRYN MAWR AVE, ROSEMONT, Illinois 60018-

WILLOW KNOLLS 14, 4100 W. WILLOW KNOLLS DR, PEORIA, Illinois 61615

ORLAND PARK CINEMAS, 16350 S. LAGRANGE ROAD, ORLAND PARK, Illinois 60467-5514

BLOOMINGTON GALAXY 14, 1111 WYLIE DRIVE, BLOOMINGTON, Illinois 61701-

GRAND PRAIRIE 18, 5311 W. AMERICAN PRAIRIE DR., PEORIA, Illinois 61615-

RANDALL 15 IMAX, 550 N. RANDALL RD., BATAVIA, Illinois 60510-

CENTURY CENTRE CINEMA, 2828 N. CLARK STREET, CHICAGO, Illinois 60657-

CARMIKE BEVERLY 18, 910 MEIJER DRIVE, CHAMPAIGN, Illinois 61821-

MARKET SQUARE CINEMA 10, 2160 SYCAMORE ROAD, DEKALB, Illinois 60115-

**Find Out What We Just Played**

**Access XRT DJ Playlists**

**Win Exclusive VIP Experiences**

**Download FREE MP3s**

**Listen To Full Albums**

**Access Additional MP3's on MP3.com**

Some of rock's coolest dudes were in town at @REUTERS
@JebsChicago last night (via @marcafterdark) Photos at facebook.com/93XRT4 hours ago

Watch Tonight's Blues Broadcast Headliner. @ShemekiaCopeland Perform Live From Studio X [video] cbsloc.al/WMFYBm @BuddyGuy4 hours ago

RT @MaryLDixon, @LinBrehmer tells you how to win a trip to London to see @RollingStones, who may win a trip to @DowntonAbbey. What? http://... 4 hours ago

Follow @93XRT!




XRT Listener Poll: Best...


XRT Listener Poll: Best...





Like    0

Connect with XRT on Facebook    FOLLOW View Comments LOGIN

Share

Story by Geno Knight, Q105 Tampa

XRT Listener Poll:
Best...

Happy Birthday Bob
Dylan...

Trick Lets You
Collect Silver
From Any Bank!

Wealthy Are
Prepping for End
of America

New Diet Pill
Frenzy

## MUSIC VIDEOS

Featured        Recent

- 5 Reasons Why The Rolling Stones Might Play an Impromptu Show While in
  Chicago
- Coachella is full of stupidly hot people (Noisey by Vice)
- Great Blues, Good Beer, Fun Birthday Party For Kenny Kinsey
- Richards Family Rolls Through West Loop

Recommended by

Track Down
Tonight Alive
VEVO

Gonna Make It
Vydamo
VEVO

Gonna Make It (Audio)
Vydamo
VEVO

**0 comments**

Leave a message...

Best    Community                      Share        ⚙

No one has commented yet.

Comment feed    Subscribe via email

CBS LOCAL Circulars
Unbeatable
Discounts
From Your
Favorite
Stores

Watch Live From
Studio X Performances

XRT Presale Privileges
FREE Concert Tickets

Life At Lolla: Your
Festival Headquarters



Lookin' hungry,
friend.        Order Food Now?        grubHub



# Review: "The Beatles: The Lost Concert"

MAY
6,
2012
|
06:27PM
PT

*Repackaging footage reportedly inaccessible for decades, "The Beatles: The Lost Concert" presents what's billed as the Fab Four's only available complete live show.*

*Dennis Harvey (http://variety.com/author/dennis-harvey/)*

Repackaging footage reportedly inaccessible for decades, "The Beatles: The Lost Concert" presents what's billed as the Fab Four's only available complete live show — their first U.S. one, played to 8,000 screaming teenagers at a Washington, D.C., sports arena in February 1964. The short set is heavily padded with archival footage of the era, plus worshipful responses from present-day musicians who have little of interest to say. The desultory results are being shown at theaters nationwide May 17 and May 22, following a world preem at Gotham's Ziegfeld May 6; completists who miss those dates will doubtless make the home-format release a profitable one.

The show was also originally broadcast via closed circuit in theaters for two days, one month after the gig itself, reportedly drawing 2 million ticketbuyers to the tune of $4 million. That package presumably included materials beyond the Beatles' half-hour performance; we don't see opening acts the Caravelles, Chiffons and Tommy Roe here, though Roe is among the present-day interviewees.

Playing for their biggest audience at the time (though much larger ones were soon to come) on a short initial American trip, just after their first "Ed Sullivan Show" appearance, the Liverpool lads seem a bit nonplussed, perhaps in part because the Washington Coliseum was unsuitable as a music venue. There were no monitors to allow them to hear themselves, and the PA system was intended primarily for sports-event announcers. The sound quality here is highly variable, to say the least. Still, that's better than most attendees got: As one recalls, unless you were seated in the front rows, you could only hear "the beat and a lot of screaming."

The set opens with George Harrison fronting a cover of Chuck Berry's "Roll Over Beethoven," then flows through early hits including "From Me to You," "I Saw Her Standing There," "All My Loving," "Please Please Me," "She Loves You" and "I Wanna Hold Your Hand." Novelties include the close three-part harmonies that dominate the lesser-known "This Boy," and Ringo Starr's rare lead vocal on "I Wanna Be Your Man" — though his mike barely registers, and that may be a mercy. Throughout, there are cutaways to mostly female viewers in varying states of extremis, albeit sitting politely. (It is noted that most U.S. teens scarcely knew how to behave at a concert then, erring on the side of caution.) Visually, multicamera footage is on the level of most live-event TV coverage of the era, primitive by today's standards.

All this will be manna to nostalgic loyalists, if only mildly impressive to anyone else. "Lost Concert" is probably not the ideal intro to the Beatles for later generations, as their repertoire was still fairly one-note, and what distinguished them then requires explanation now. To that end, several surviving business associates, journos and fans recall Beatlemania's impact and the era in general as illustrated by the requisite archival materials. That's OK as far as it goes, though underwhelming; few insights will be news to most viewers, some trivia aside, though the idea that the band benefited from media hunger for a happy news story, at a time when the mourning period for President Kennedy was due to end, is an interesting theory.

The pic's biggest waste of space, however, comes in the form of celebrity musicians who are mostly shot watching the footage, presumably agog with adoration. Too bad almost none of them — including two Strokes, Aerosmith's Steve Tyler and Joe Perry, Brit pop thrush Duffy and Chuck Berry himself — have anything remotely intelligent to say.

**The Beatles: The Lost Concert**

**Production**
An Iambic Media production for WPMC. Produced by Chris Hunt, Steve Cole. Executive producers, Larry Marion, Marty Marion. Directed by Steve Cole.

**Crew**
Camera (color/B&W, HD/video), Simon Wagen; editor, Paul Aviles; sound, Colin Bowes, Rob Freeman, Alex Herrera, Caleb Mose, Michael Stahr, Chuck Stanton, Nick Walker, Philz Hearne; restoration, Richard Watson. Reviewed on DVD, San Francisco, May 1, 2012. Running time: 95 MIN.

**With**
Chuck Berry, Sid Bernstein, Louise Harrison, Steven Tyler, Joe Perry, Albert Hammond Jr., Nick Valensi, Duffy, Mark Ronson, Mike Mitchell, Maureen Cleave, Ed Rudy, Tommy Roe, Bruce Spizer, Paul Gambaccini, Larry Kane, John B. Lynn, Barry Richards, Ron Oberman, Beverly Rubin, Jamie Heigel Leier, Naomi Banks.



# THE BEATLES: THE LOST CONCERT Documentary Coming to U.S. Theaters 5/17 & 22

by Movies News Desk


Screenvision, in partnership with Ace Arts, and multiple-award winning music documentary producer

Iambic Media, brings one of the music world's true "lost treasures" to the big screen with the feature presentation of THE BEATLES: THE LOST CONCERT. The new 92-minute documentary charts the birth and impact of Beatlemania in America and includes, in its entirety, their first-ever full U.S. concert performance from February 11, 1964 at D.C.'s Washington Coliseum, the only complete Beatles' concert available to fans, one which has remained unseen by movie theater audiences across the nation for over 47 years. Rock superstar and American Idol judge commented: "This blows away every performance I've ever seen, including Elvis!"

The story of their historic arrival in America and the impact they had is revealed through new interviews with more than 20 Beatles' associates, journalists, disc jockeys, concert attendees, historians and music luminaries and archival footage of the Fab Four. The list includes Aerosmith's          and Joe Perry, rock pioneer              , super producer Mark Ronson, journalists Maureen Cleave, Larry Kane and Ed Rudy, concert promoter              , Beatle George's sister          on, The Strokes'              Jr. and Nick Valensi, chart-topping U.K. songstress Duffy, renowned Beatles histor          Spizer, and Mike Mitchell, whose recently unearthed photos of the event are seen throughout the movie.

Exhibit B - Page 027

On February 11, 1964, two days after their record shattering appearance on "The               Show," The Beatles traveled by train through a snowstorm to Washington, D.C. to perform their first-ever concert before an American audience at The Washington Coliseum, before an overbooked audience of 8,092 screaming (mostly female) teenagers. Their 12-song set that lasted a little over a half-hour and included both chart-topping originals like "She Loves You" and high-energy covers like "Twist and Shout." Professionally filmed by an eight-camera crew and mixed live on location, the show was broadcast a month later via closed-circuit to movie theaters across America to two million teenagers. The film of the concert was then lost and remained unseen in its entirety by audiences for over 47 years! The original master tapes have now been restored and re-mastered and the entire concert, the ONLY complete Beatles concert available to fans, is included in The Beatles: The Lost Concert.

Sure to rekindle the fires of Beatlemania for both the generation who lived it and the younger ones influenced by it, the event will be shown in movie theaters across the U.S. in a limited engagement on May 17 and 22, 2012. In addition, a special World Premiere is scheduled at New York's landmark Ziegfield Theater on May 6 with two showings. For information, including detailed history, movie trailer and tickets, go to www.lostbeatlesconcert.com.

The resonating impact of the Beatles' in performance is illustrated in the raves given in interviews during the documentary. Commenting on them as musical competition for all who came in their wake, Mark Ronson, the producer behind hits from               and Adele, adds: "You're always going to be standing in the shadow of The Beatles." U.K. pop sensation Duffycalls them "the Holy Grail of music," while Mike Mitchell, the young photographer who chronicled the show, adds: "The concert was like being in the delivery room at the birth of an entire generation." Tommy Roe, one of their opening acts that evening may have put it best: "This is history!"

# Beatles' 'lost concert' found

NEW YORK — The Beatles are hitting theaters nationwide

Recently discovered footage of the Fab Four's first full-length concert in the United States is the subject of a new documentary "The Beatles: The Lost Concert

Recorded at Washington Coliseum in February 1964 to an overbooked teenage audience of 8,000 screaming fans, the 12-song set included "She Loves You" and "I Saw Her Standing There." The show came just two days after the group's landmark appearance on "The Ed Sullivan Show."

The documentary covers the band's historic arrival in America and includes new interviews with Steven Tyler, Chuck Berry, Mark Ronson and others.

The film's world premiere is scheduled at New York's Ziegfeld Theatre on May 6, and will be in 450 theaters nationwide on May 17 and 22. AP

Copyright 2013 Associated Press. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed

© 2011 Sun-Times Media, LLC. All rights reserved. This material may not be copied or distributed without permission. For more information about reprints and permissions, visit
To order a reprint of this article,





Smashing Pumpkins

 I did see the Washington Coliseum concert in my local theater and I'll never forget it. It was so cool watching it on the screen and knowing it was happening live at the same time. My friend and I screamed the whole time- just as if we were actually at the concert- as did all the other fans there. Can't wait to see it again and re-live that time!

Korn

 The reason they didn't like touring was because the PA systems didn't work very well and the screaming pissed them off. Good Heil and Electrovoice systems didn't come along until 1969 and they also found that mounting the PA speakers high allowed the sound to cascade down. I certainly hope the recording is good quality.

*more live show reviews*

*Newsfeed*

## Featured News



Palms



Zardonic



Guns N' Roses



Marco Beltrami



Rusted Root

*more featured news »*

*more newsfeed*





# *The Beatles: The Lost Concert* Limited Screening at Landmark's Century Centre Cinema



*The Beatles performing at The Washington Coliseum. February 11th, 1964.*

On Feb. 11, 1964, two days after the group's legendary appearance on *The Ed Sullivan Show*, The Beatles performed their first full-length concert in the United States at the Washington Coliseum in Washington D.C.

On a cold and snowy night, The Beatles took the stage in front of over 8,000 hysterical fans (it's important to note that the Washington Coliseum had a maximum capacity of 7,000), tearing through a 12-song, hour-long set that included songs such as "I Saw Her Standing There," "Twist and Shout," and "She Loves You."

Many Beatles aficionados regard the D.C performance as a landmark event not only in The Fab Four's career, but also in the history of pop music. Although their invasion of America appeared to be an overnight conquest, The Beatles had actually spent close to seven years struggling to do anything outside of playing small clubs throughout the UK and Europe. Breaking into the American market had long been a dream of The Beatles; in their rose-tinted eyes America symbolized all-encompassing success, as well as the home of their heroes such as Little Richard, Chuck Berry, and Elvis Presley. But even as the band began to encounter celebrity status in the UK, they were still unable to crack into the American market.

The February 11th show at the Washington Coliseum was The Beatles' long-awaited pay-off: An accumulation of seven years of grueling schedules and hard work finally coming to fruition. Although The Beatles would give up touring only a few years later, the Washington, D.C., show captures The Beatles at the pinnacle of their live performances; a moment where ceasing live performances was the last thing on The Fab Four minds. Instead of being annoyed by the constant screaming from the frenzied crowd, as they would admittedly later become, The Beatles were overwhelmed by the crowd's uncontrollable fervor. And while The Beatles performed that night on top of a makeshift boxing ring, it is clear from the performance footage that John, Paul, George, and Ringo were all actually standing on Cloud 9: bopping around stage in front of the over-capacity crowd they had always dreamed of playing in front of, officially paving the way for the coming British Invasion and solidifying Beatlemania in America.

Exhibit B - Page 033



*A ticket-stub from the Washington Coliseum performance. Price of admission for a Beatles concert in 1964: $4.00.*

Probably one of the most incredible parts about The Beatles' Washington Coliseum performance — as well as the majority of their early performances — is the fact that they have no stage monitors or tuners on stage with them. They're playing in front of thousands and thousands of people who are screaming at the top of their lungs from start to finish, and they have no way to hear themselves or each other. Many modern musicians not only perform with various tuners (or live auto-tuning - Yuck!) and a plethora of stage monitors, but they also have in-ear monitors and numerous people running the stage sound. *Not The Beatles.* They took the stage, plugged straight into their Vox amplifiers, and rocked harder and played tighter than most modern bands with all the technological advancements and conveniences of modern live sound could ever dream of. The Beatles' live-show often get's a bad wrap, but I challenge any band to play in front of 8,000-10,000 screaming fans without any way to monitor yourself and play as well as The Beatles.

Steve Cole's documentary,                                                , examines the cultural impact of The Beatles' show at the Washington Coliseum, as well as explores the group's first trip to America through original interviews, historical footage, unpublished photos and rare artifacts. While the film is being publicized as "the lost concert," the Washington Coliseum performance footage has in fact never been "lost." If you're an avid Beatles fan, you've most likely come across the greater majority of this footage through "The Beatles Anthology" or commonplace Beatles bootlegs. What Cole's documentary does have to offer is exclusive interviews with music journalists and musicians, such as members of The Strokes, Steven Tyler, Chuck Berry, Mark Ronson, and fans who attended the 1964 concert, as well as a fully restored and remastered version of the historic event.



*The Beatles performing at The Washington Coliseum. February 11th, 1964.*

*The Beatles: The Lost Concert* has a limited two-day theatrical engagement across select cities in the U.S., and fortunately Chicago is one of those cities. On Thursday, May 17 at 7:30 p.m. and Tuesday, May 22 at 7:30 p.m.*The Beatles: The Lost Concert* will be screened at The Landmark's Century Centre Theater at Clark and Diversey.

Chicagoland Beatles Fans: Here's your chance to see one of the band's best live performances in its entirety on the big screen, with fully remastered sound. Until they make this performance holographic (which may happen sooner than later), this is the best bet modern-day Beatles fans have of understanding what it felt like to see The Fab Four live. It's doubtful that the "talking-heads" portion of the film will provide any new or innovative insight into The Beatles exceedingly well-documented history, but who knows — maybe Steven Tyler will rattle off a one-liner about what The Beatles meant to him as a youth and you'll find yourself excusing yourself to run to the bathroom and cry. Maybe. Probably not. But you'll never know if you don't go.

Check out the official trailer for *The Beatles: The Lost Concert* below.

*For more tickets and showtimes to "The Beatles: The Lost Concert" visit*

# EXHIBIT C

Complaint for Damages and Injunctive Relief

*Ace Arts, LLC v. Sony/ATV Music Publishing, LLC, et al.*

Chain of custody of the Beatles *Washington* Coliseum Concert Recording

The purpose of this letter is to outline the chain of custody of The Beatles Washington Coliseum 1964 concert footage. This information contained herein is true and accurate to the best of my knowledge.

The concert was filmed by National General Corporation (NGC) in 1964. Eugene Klein was the Chairman of the Board and chief stockholder of National General Corporation (an insurance and entertainment company). In the early 1970s he passed ownership and custody of the master tape of the concert to Malcolm Klein along with several other master recordings of concerts that NGC had been hired to film.

In 1987 I, James Karnbach bought the tape of The Beatles Washington Concert and other recordings from Malcolm Klein and made a Beta cam copy of the tape as a safety backup copy to preserve it. I sold the original tape in 1995 and kept the Beta cam copy for my reference and possible future use. In 2009 I sold the Beta cam tape and whatever rights, title and interest that I held in it to Larry Marion who subsequently transferred those rights, title and interest to WPMC Limited.

James Karnbach
7 East 14th Street
New York, NY 10003 USA

James Karnbach – May 23, 2011

Exhibit C - Page 036

# EXHIBIT D

Complaint for Damages and Injunctive Relief

*Ace Arts, LLC v. Sony/ATV Music Publishing, LLC, et al.*

THE SOURCE - Other Tapes - Washington Coliseum Februra

http://www.beatlesource.com/bs/to-washinton1.html

# Washington Coliseum
## Februrary 11, 1964

Home    Other Tapes





This reel of video tape was auctioned by It's Only Rock And Roll in 2005. The auction description says it all

**AUCTION DESCRIPTION:**

1964 "It's Only Rock a Roll" has been at the forefront of bringing to you a multitude of world-class memorabilia items related to popular music and culture for many years, most recently through our series of auctions. We are so excited to have the opportunity to offer the original state of the art, one of a kind, broadcast master two-inch quad videotape of the Beatles first American concert at Washington Coliseum.

The phenomenon know as "Beatlemania" arrived on American shores from Great Britain when the Beatles landed at New York's Kennedy airport for their first appearance on the Ed Sullivan Show. Several days later, on February 11, the recently nick named "Fab Four" appeared in front of their first American audience at the Coliseum in Washington, D.C.

The historic event was videotape recorded for nationwide closed circuit theatre distribution. Packaged as a 90 minute show with the Beach Boys and Lesley Gore, the Washington D.C. concert was simultaneously beamed to theaters through telephone lines a total of four times over two weekends in March 1964. Were you one of the lucky attendees? If you were there, you were a participant in the first pay-per-view rock concert event ever staged!

In the 41 years since the original closed circuit broadcasts, an endless variety of poor quality kinescopes transferred to video versions of the concert have circulated on bootleg imports and, most recently, as a commercially released DVD. These versions are missing the onstage announcements and footage of the Beatles running through the audience enroute to the stage. In addition, these inferior copies end abruptly midway through "Twist & Shout," and are totally missing the finale of "Long Tall Sally" and footage of the Beatles leaving the stage. Even the footage seen by millions on the Beatles Anthology series was far removed in picture and sound quality from what fans saw in their local theaters in March 1964. That is, of course... until now!

Many of you may be unaware of the fact that fellow Capitol Record's artists the Beach Boys and recent Mercury Records singing sensation Lesley Gore were also seen by closed circuit to those in attendance.

Their performances, videotaped at NBC TV Studios in Burbank, California, in late January '64 were hosted by Los Angeles disc jockey Roger Christian. Christian is seen on stage as the Master of Ceremonies for Gore and the Beach Boys while also plugging the Beatles several times. In addition, a commercial for a "big" poster available for $1.00 by mail

1 of 2

Exhibit D - Page 037



precedes the Beatles portion of the telecast. You may have seen the Beach Boys performance since its release on DVD several years ago. That performance, however, is missing one song as well as Christian's introduction and the band coming onto and leaving the stage. The Lesley Gore performance has not been seen in any form since the closed circuit telecasts.

There exists no title or copyright regarding this show and no copyright notices are seen on this master tape. In addition, the company that filmed and produced the presentation has been out of business for over 35 years.

The videotape has been inspected and viewed at a professional lab (keep in mind that this format has been obsolete since 1980) and the technician concurs that this tape is, indeed, the first generation master. He has supplied a letter to that effect, in addition to detailing the procedure of how to deal with this obsolete format. The actual reel and box to which the tape has been housed since 1964 weighs in at approximately 25 pounds.

A screening can be arranged in Manhattan for seriously interested bidders that meet certain qualifications.

We can unequivocally say that there exists no other videotaped Beatles concert that remotely approaches the quality of this performance by the Beatles at Washington Coliseum

Exhibit D - Page 038

# EXHIBIT E

Complaint for Damages and Injunctive Relief

*Ace Arts, LLC v. Sony/ATV Music Publishing, LLC, et al.*

## Copyright Research Report

THOMSON COMPUMARK

| | |
|---|---|
| **Property Searched:** | THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT |
| **Client Name:** | IAMBIC PRODUCTIONS |
| **Attention:** | ANGELA HALL |
| **Type Of Search:** | U.S. Full Copyright Search |
| **Our File:** | 174658411 |
| **Date Completed:** | July 27, 2010 |
| **Date Received:** | July 22, 2010 |

We have taken all reasonable steps to ensure the completeness and accuracy of this report; however, for various reasons, including but not limited to the highly subjective nature of modern-day copyright and title searching and the potentially incomplete and inaccurate data provided by the many vendors, publishers and other data sources used in compiling search reports, we cannot warrant that this report is complete or error-free or otherwise guarantee results. AS A RESULT, WE DISCLAIM ALL WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

This search is valid only for the mark, goods, property or title noted above. If the mark, goods, property or title that were the subject of this search change even slightly, a new search should be performed. This report in no way constitutes a legal opinion. If applicable, the ranking of cited references into groups based on their relative relevance to the property searched is for the convenience of our clients in reviewing the search report and is not intended to convey an opinion regarding the legal significance of any cited reference. Acceptance and reliance upon this report constitutes an acceptance of its terms, conditions and limitations. Any liability arising out of the preparation of this report is limited to a refund of this search fee paid.

Thomson CompuMark, 1100 13th St. NW Ste. 300, Washington, DC 20005
Telephone (800) 356-8630 or (202) 756-9292 • Fax (202) 756-9299

# Table of Contents

Copyright Report

ANALYST REVIEW ................................................................3

IDENTIFYING INFORMATION ................................................. . .4

DERIVATIVE WORKS ...................................... ..........5

OF INTEREST ............... .... ......... ... ...................... .7

RECORDED INSTRUMENTS ...................... .... ........8

NOTES .. ....... ........ .................................................. .. ...8

Exhibit E - Page 040

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON
COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT

## Analyst Review − Copyright Report

Search Information

| | |
|---|---|
| Type of Search: | U.S. Full Copyright Search |
| Property: | THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CON-CERT A.K.A. THE BEATLES IN CONCERT |

Data Information

Our copyright analysts search electronic records of the US Copyright Office, and on site at the Copyright Office investigate print card files and in−process copyright filings, in addition to Library of Congress records and other extensive entertainment industry sources in order to develop comprehensive reporting on specific works, and other properties and rights related to those works. The sources for each search may be tailored based on the kinds of properties involved.

The Full US Copyright search investigates creation and publication, copyright registration and renewal status, and assignment history of a specific work and any underlying material upon which it is based. Coverage of derivative works is also provided. The level of detail reported on some derivative works may vary depending on the type of use.

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON
COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT

Copyright Report – THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT
THE WASHINGTON COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN
CONCERT

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM aka THE BEATLES AT THE WASHINGTON COLISEUM aka THE BEATLES FIRST AMERICAN CONCERT aka **THE BEATLES IN CONCERT**: U.S. motion picture in approximately 90 minutes running time, featuring the Beatles in their first American concert performance, filmed at the Coliseum in Washington D.C. on February 11, 1964.

You indicated in your request that this motion picture carries credits indicating that it was presented by National General Corp., produced by Concerts Inc., and presented by courtesy of Brian Epstein and NEMS Enterprises Ltd.

According to the "The Pop History Dig" website (pophistorydig.com), the Beatles' Washington DC concert at the Washington Coliseum was filmed in black and white video by CBS with permission of the Beatles' then manager, Brian Epstein, and the filmed version was packaged into a "closed-circuit" offering by a private company, to be aired several weeks later at selected theaters across the U.S.

According to Variety, issue of February 26, 1964, National General Corp. had booked **THE BEATLES** to launch its new closed-circuit television theatre network, with a four-performance weekend planned for March.

**Release:** According to "The Pop History Dig" website, the first closed-circuit showing of the filmed version of the concert took place on March 14, 1964, at venues that included the Stanley Theater in Pittsburgh, PA, the Hippodrome Theater in Cleveland, OH, the El Monte Legion Stadium in El Monte, CA, the Public Auditorium in Portland, OR, and possibly others. A second showing on March 15, 1964, was fed to additional theaters, including venues in Norfolk, VA, Oak Park, IL, San Jose, CA, and Washington DC.

**Copyright Information:** We find no record of copyright registration or subsequent renewal for this work as presented in 1964.

The following registration is of record in connection with what appears to be a subsequent version of this motion picture:

THE BEATLES IN WASHINGTON DC : FEB. 11TH, 1964: Motion picture in one videodisc, created in 2003, and **registered for copyright** as an unpublished work in the name of Passport International Productions of California, Inc., August 28, 2003, under entry No. PAU: 2-808-718. The application author is identified as Passport International

Exhibit E - Page 042

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON
COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT

Productions of California, Inc., employer for hire, as author of arrangement, editing, compilation of photos and footage. The record describes the preexisting material *as some audiovisual material, footage & music.* Copyright is claimed on editing and compilation.

**Availability:**  Television: Not currently listed as available.

Video: Currently listed as available under the title THE BEATLES: IN WASHINGTON D.C., but no distributor is given.

According to "The Pop History Dig" website, footage from the February 11, 1964 concert was used in a number of documentaries, including THE BEATLES ANTHOLOGY.

**Television Motion Picture:**  THE BEATLES ANTHOLOGY, a three-part television documentary, with episodes of approximately two hours running time each, directed by Geoff Wonfor, and produced by Chips Chipperfield for Apple Corps Limited.

**Broadcast:**  Broadcast in the U.S. on November 19, 22, and 23, 1995, over the ABC Entertainment Group network.

**Copyright Information:**  THE BEATLES ANTHOLOGY: Motion picture in six videocassettes, international version, created in 1995, published October 30, 1995, and **registered for copyright** in the name of Apple Corps. Ltd. (employer for hire), December 5, 1995, under entry No. PA: 792-768. The record notes that the work contains preexisting footage and recordings. Copyright is claimed on compilation and editing of materials and new cinematographic material. The registration record indicates that there was correspondence with the Copyright Office before registration of this work was permitted.

THE BEATLES ANTHOLOGY: Motion picture in six videocassettes, U.S. version, created in 1995, published November 15, 1995, and **registered for copyright** in the name of Apple Corps. Ltd. (employer for hire), November 28, 1995, under entry No. PA: 792-767. The record notes that the work contains preexisting footage. Copyright is claimed on compilation and editing of materials and new cinematographic material. The registration record indicates that there was correspondence with the Copyright Office before registration of this work was permitted.

Subsequent versions of this work were registered for copyright as follows:

THE BEATLES ANTHOLOGY: Motion picture in eight videocassettes, created in 1996,

Exhibit E - Page 043

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT

published September 11, 1996, and **registered for copyright** in the name of Apple Corps Ltd (employer for hire), October 29, 1996, under entry No. PA: 801-328. The record notes that the work contains preexisting footage, photos, text, sounds, and some material previously registered under PA: 792-767 and PA. 792-767. Copyright is claimed on compilation and editing of old materials, plus new cinematographic materials, text, sounds and photos.

THE BEATLES ANTHOLOGY: NO. 1-8: Motion picture in five videocassettes, English with German, English, French and other subtitles, created in 2003, published April 1, 2003, and **registered for copyright** in the name of Apple Corps. Ltd. , October 6, 2003, under entry No. PA: 1-207-590. The record refers to previously registrations under PA: 792-767 and PA: 792-767. Copyright is claimed on compilation and editing of preexisting footage, photos, text and sounds form 1940s through 1990s, and new cinematographic materials, text sounds and photos.

| | |
|---|---|
| Related Materials Summary: | The records disclose additional registrations in connection with trailers, musical compositions, a press kit, posters and packaging, a sound recording, and a book related to this documentary television series. |
| Availability: | Television: Disney/ABC International Television (one 360-min. episode or three 120-minute episodes)(worldwide) |
| | Video: Midwest Tape, The Video Collection; Turner Broadcasting Systems Inc. |

In addition, reference is made to the following as possibly containing footage from the February 11, 1964 concert:

| | |
|---|---|
| Motion Picture: | THE BEATLES: THE FIRST U.S. VISIT: Motion picture, released on video in 1991. |
| Copyright Information: | THE BEATLES: **THE FIRST U.S. VISIT**: Motion picture in one videocassette, short version, crated in 1991 and **registered for copyright** as an unpublished work in the name of Apple Corps, Ltd., October 24, 1991, under entry No. PAU: 1-585-015. The record notes that some footage was previously registered. Copyright is claimed on additional unpublished film footage added to preexisting film footage which has been re-edited. The registration record indicates that there was correspondence with the Copyright Office before registration of this work was permitted. |
| | **THE BEATLES: THE FIRST U.S. VISIT**: Motion picture in one videocassette, long version, crated in 1991 and **registered for copyright** as an unpublished work in the name of Apple Corps., Ltd., October 24, 1991, under entry No. PAU. 1-585-021. The record notes that |

Exhibit E - Page 044

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON
COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT

some footage was previously registered. Copyright is claimed on additional unpublished film footage added to preexisting film footage which has been re-edited. The registration record indicates that there was correspondence with the Copyright Office before registration of this work was permitted.

**Availability:**    Television: Not available
Video: MPI Home Video; Baker & Taylor Inc.

There are a number of additional documentaries about the performing group The Beatles, possibly containing footage from the February 1964 Washington DC concert.

---

The following registration is of record in connection with a recording of an interview with the Beatles the same day as the concert:

THE CARROLL JAMES INTERVIEW WITH THE BEATLES : WASHINGTON D.C., FEB. 11, 1964: Recording in one sound disc, created in 1984 and **registered for copyright** as an unpublished work in the name of Carroll S. James, Jr., June 20, 1984, under entry No. SRU: 64-234. The application author is identified as Carroll Staley James Jr. as author of text and sounds. The preexisting material is described as the interviews. Copyright is claimed on text and sounds of narration. The registration record notes that there was correspondence with the Copyright Office before registration of this work was permitted.

The "Pop History Dig" website also reports:
" ...a reported master tape of the CBS film of the Beatles' D.C. concert surfaced on teh internet, appearing at the website *BeatleSource.com*, displayed in its shipping box. According to this site, the tape was auctioned off by 'It's Only Rock and Roll' in 2005 to an unnamed bidder for an unspecified price.

"In the website's description of the mater tape, however, it is noted: '...a variety of poor quality kinescopes transferred to video versions of the concert have circulated on bootlegs, imports and, most recently, a commercially relased DVD. These versions are missing the onstage announcements and footage of the Beatles running through the audience en route to the stage. In addition, these inferior copies end abruptly midway through . . . and are totally missing the finale . . . and footage of the Beatles leaving the stage.' "

THE BEATLES IN CONCERT AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES AT THE WASHINGTON COLISEUM A.K.A. THE BEATLES FIRST AMERICAN CONCERT A.K.A. THE BEATLES IN CONCERT

| | |
|---|---|
| **Certificate of Amendment of Articles of Incorporation:** | By Certificate of Amendment of Articles of Incorporation dated **May 26, 1969**, recorded April 21, 1970, in Vol. 1378, pages 218–222, National General Television Distribution, Inc., changed its corporate name to NGC Television, Inc. No titles are given in this document. |
| **Short Form Assignment:** | By Short Form Assignment dated **June 26, 2000**, recorded July 5, 2000, in Vol. 3455, doc. 173, pages 1–3, Allied Artists Corporation granted to Trimark Pictures, Inc., all its right, title and interest in **BEATLES, WASHINGTON, DC, CONCERT** and 42 other titles, throughout the universe in perpetuity, including the sole and exclusive right to release, distribute, exploit, market, issue, reissue and otherwise dispose of and use the works, using any methods of exhibition or exploitation in any media, subject to the terms of the Agreement dated as of July 19, 1999, between the parties. |

No further document affecting any right right, title or interest in the motion picture version of the Beatles 1964 Washington DC concert, or the motion pictures **THE BEATLES ANTOLOGY** or **THE BEATLES – THE FIRST U.S. VISIT** is found of record in the Copyright Office.

We have searched the public access in-process records at the U.S. Copyright Office in connection with this property. Thomson CompuMark also maintains a proprietary database of materials submitted on behalf of its clients since August 2007. These records have also been searched in connection with this property.

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Michael Fitzgerald and the assigned discovery Magistrate Judge is Charles Eick.

The case number on all documents filed with the Court should read as follows:

### CV13- 4096 MWF (Ex)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=========================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
**CIVIL COVER SHEET**

**I. (a) PLAINTIFFS** ( Check box if you are representing yourself ☐ )

ACE ARTS, LLC

**DEFENDANTS** ( Check box if you are representing yourself ☐ )

SONY/ATV MUSIC PUBLISHING, LLC; APPLE CORPS LIMITED

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

GRETCHEN M. NELSON (112566)
KREINDLER & KREINDLER LLP
707 WILSHIRE BLVD., SUITE 3600
LOS ANGELES, CA 90017  (213) 622-6469

**(b) Attorneys** (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
112

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1. U.S. Government Plaintiff

☐ 2. U.S. Government Defendant

☒ 3. Federal Question (U.S. Government Not a Party)

☐ 4. Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES**-For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1. Original Proceeding

☐ 2. Removed from State Court

☐ 3. Remanded from Appellate Court

☐ 4. Reinstated or Reopened

☐ 5. Transferred from Another District (Specify)

☐ 6. Multi-District Litigation

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No  (Check "Yes" only if demanded in complaint.)

**CLASS ACTION under F.R.Cv.P. 23:** ☐ Yes ☒ No  ☒ **MONEY DEMANDED IN COMPLAINT:** $ According to Proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Antitrust claims for violations of Sherman Act, 15 U.S.C. § 1 and the Clayton Act, 15 U.S.C. §§ 15(a) and 26 and supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

**VII. NATURE OF SUIT** (Place an X in one box only).

| OTHER STATUTES | CONTRACT | REAL PROPERTY CONT. | IMMIGRATION | PRISONER PETITIONS | PROPERTY RIGHTS |
|---|---|---|---|---|---|
| ☐ 375 False Claims Act | ☐ 110 Insurance | ☐ 240 Torts to Land | ☐ 462 Naturalization Application | **Habeas Corpus:** | ☐ 820 Copyrights |
| ☐ 400 State Reapportionment | ☐ 120 Marine | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | ☐ 463 Alien Detainee | ☐ 830 Patent |
| ☒ 410 Antitrust | ☐ 130 Miller Act | ☐ 290 All Other Real Property | | ☐ 510 Motions to Vacate Sentence | ☐ 840 Trademark |
| ☐ 430 Banks and Banking | ☐ 140 Negotiable Instrument | **TORTS** | **TORTS** | ☐ 530 General | **SOCIAL SECURITY** |
| ☐ 450 Commerce/ICC Rates/Etc. | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | **PERSONAL INJURY** | **PERSONAL PROPERTY** | ☐ 535 Death Penalty | ☐ 861 HIA (1395ff) |
| ☐ 460 Deportation | | ☐ 310 Airplane | ☐ 370 Other Fraud | **Other:** | ☐ 862 Black Lung (923) |
| ☐ 470 Racketeer Influenced & Corrupt Org. | ☐ 151 Medicare Act | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 540 Mandamus/Other | ☐ 863 DIWC/DIWW (405 (g)) |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Vet.) | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 550 Civil Rights | ☐ 864 SSID Title XVI |
| ☐ 490 Cable/Sat TV | | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 555 Prison Condition | ☐ 865 RSI (405 (g)) |
| ☐ 850 Securities/Commodities/Exchange | ☐ 153 Recovery of Overpayment of Vet. Benefits | ☐ 340 Marine | **BANKRUPTCY** | ☐ 560 Civil Detainee Conditions of Confinement | **FEDERAL TAX SUITS** |
| ☐ 890 Other Statutory Actions | ☐ 160 Stockholders' Suits | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | **FORFEITURE/PENALTY** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 891 Agricultural Acts | ☐ 190 Other Contract | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 893 Environmental Matters | ☐ 195 Contract Product Liability | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | ☐ 690 Other | |
| ☐ 895 Freedom of Info. Act | ☐ 196 Franchise | ☐ 360 Other Personal Injury | ☐ 440 Other Civil Rights | **LABOR** | |
| ☐ 896 Arbitration | **REAL PROPERTY** | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 710 Fair Labor Standards Act | |
| ☐ 899 Admin. Procedures Act/Review of Appeal of Agency Decision | ☐ 210 Land Condemnation | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 720 Labor/Mgmt. Relations | |
| | ☐ 220 Foreclosure | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | ☐ 443 Housing/ Accomodations | ☐ 740 Railway Labor Act | |
| ☐ 950 Constitutionality of State Statutes | ☐ 230 Rent Lease & Ejectment | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 445 American with Disabilities-Employment | ☐ 751 Family and Medical Leave Act | |
| | | | ☐ 446 American with Disabilities-Other | ☐ 790 Other Labor Litigation | |
| | | | ☐ 448 Education | ☐ 791 Employee Ret. Inc. Security Act | |

**FOR OFFICE USE ONLY:**  Case Number: _____  CV13- 4096

AFTER COMPLETING PAGE 1 OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED ON PAGE 2.

CV-71 (02/13)  CIVIL COVER SHEET  Page 1 of 2

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES**: Has this action been previously filed in this court and dismissed, remanded or closed?   ☒ NO   ☐ YES

If yes, list case number(s): _____

**VIII(b). RELATED CASES**: Have any cases been previously filed in this court that are related to the present case?   ☒ NO   ☐ YES

If yes, list case number(s): _____

Civil cases are deemed related if a previously filed case and the present case:

(Check all boxes that apply)   ☐ A. Arise from the same or closely related transactions, happenings, or events; or

☐ B. Call for determination of the same or substantially related or similar questions of law and fact; or

☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or

☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE**: (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.

☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New York, New York |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.

☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| SONY/ATV Music Publishing LLC, Apple Corps Limited | Los Angeles County United Kingdom |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**NOTE: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County | New York, New YOrk |

*Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved

**X. SIGNATURE OF ATTORNEY (OR SELF-REPRESENTED LITIGANT):** _____   DATE: 6 6 2013

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405 (g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405 (g)) |